813 So.2d 598 (2002)
Byron K. LANDRY
v.
Luke BELLANGER, Jr.
No. 2000 CA 2029.
Court of Appeal of Louisiana, First Circuit.
March 28, 2002.
*601 Carlton J. Cheramie, Cut Off, for Plaintiff-Appellee Byron K. Landry.
Jerry B. Jordan, New Orleans, for Defendant-Appellant Luke Bellanger, Jr.
Before: FOIL, FOGG, and PETTIGREW, JJ., and KLINE and CIACCIO, JJ., Pro Tem.[1]
PETTIGREW, J.
In this suit for personal injuries, the trial court rendered judgment in favor of plaintiff for injuries sustained as a result of an altercation with the defendant. The trial court apportioned 100 percent of the fault to defendant and awarded damages totaling $744,278.41. It is from this judgment that defendant has appealed. For the reasons that follow, we vacate in part, reverse in part, amend, and as amended, affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Bryon K. Landry, is a native of Lafourche Parish who had been working and living in Florida. On occasion, he traveled to Lafourche Parish on business. On June 27, 1996, Bryon was in Lafourche Parish; and he and his father, Ernest Landry, went to a local bar, Steve's Chevron, for a drink. According to Bryon, he had "probably one or two beers" before going to Steve's Chevron. Once they arrived at the bar, Bryon and his father each ordered a beer, and Bryon also drank a shot of peppermint schnapps. While there, Bryon saw defendant, Luke Bellanger, Jr., a former high school classmate of his who he had known for more than 20 years. The two shook hands and gave each other a little hug. Bryon then introduced his father to Luke, and the men sat down at the bar and drank some beer.
Bryon's father left Steve's Chevron around 9:30 p.m., but Bryon stayed behind drinking and visiting. Luke offered to give Bryon a ride home. Luke then left the bar to attend to other business with plans to return before closing time to pick up his girlfriend, who was working at the bar at the time. As the evening progressed, Bryon drank steadily over the next several hours, consuming approximately eight beers. Luke returned to the bar with his friend, Lonnie Bell; and Bryon was still there. Luke indicated he could tell that Bryon had "had a few drinks." Lonnie, who testified by deposition, stated that he witnessed the interaction between Bryon and Luke and that Bryon appeared to be intoxicated. In fact, Bryon even admitted that he was "feeling a little bit tipsy."
According to Luke, Bryon began talking in a loud voice and became very belligerent toward him. Bryon continued to harass and insult Luke, suggesting that Luke never had to work a day in his life and was born with a "silver spoon" in his mouth. Luke continually asked Bryon to calm *602 down and leave him alone but Bryon continued, becoming louder and more aggressive. Lonnie corroborated Luke's account of the events leading up to this point, testifying as follows: "Mr. Bellanger repeatedly... had asked Mr. Landry ... to please leave him alone. Asked him repeatedly... to please calm down because he was getting a little hostile. Toward the end before they had their encounter, Mr. Landry was in Mr. Bellanger's face practically." Lonnie added further that at no time did Luke threaten Bryon or say anything threatening to him.
When asked if Bryon had issued a challenge to him or made any threatening comments to him, Luke testified that Bryon walked up to him, poked him in the chest and said "if I wasn't such a f_____ p_____, he would take me outside [and] whip my ___." At that time, Luke asked Bryon to step outside so they could talk, hoping he could get Bryon to calm down. Luke and Bryon then left the bar through the front door and stepped outside. Luke described what happened after they exited the bar, as follows:
I got up, walked towards the bar and I walked out first. He came out behind me. I walked about 10 feet from the door, I turned around and tried to tell him, Bryon, we don't need to do this, you know, this is stupid. We're friends, there's no need for us to fight. He walked up to me and started pushing me with his chest and telling me, yes, I'm going to whip your ___. I kept stepping back, I said, Bryon, we don't need to do this. Well, he pushed me; when he pushed me, he kept on coming. The only thing I could do was I had to defend myself.
According to Luke, he then struck Bryon in the head with a partially closed fist, and Bryon fell backwards and hit his head on the cement.
Bryon's version of the events is slightly different. Bryon recalls that he and Luke argued about a woman and then Luke asked him to step outside. According to Bryon, he walked out of the door first; and before he could even turn around, he was struck by something and fell to the ground. The next thing Bryon remembers is waking up at his parents' house the following day.
Lonnie Bell testified that he witnessed the entire incident, watching through the glass door from inside the bar. Lonnie indicated that prior to Luke and Bryon going outside, it had "started to get pretty heated between the two;" and Luke asked Bryon to "step outside because he was starting to cause a scene inside of the bar." Lonnie reiterated that at no time did Luke threaten Bryon. When asked what happened next, the following colloquy occurred:
Q. All right. As best you can recall, was the first punch or the first action, physical action taken by one person to another person taken by Mr. Landry toward Mr. Bellanger or by Mr. Bellanger toward Mr. Landry?
A. Mr. Landry toward Mr. Bellanger.
Q. All right. As best you can recall, will you please tell us what happened at that time.
A. As they exit out of the bar I had turned and looked toward them. Mr. Landry had pushed Mr. Bellanger with his chest.
Lonnie then saw Luke hit Bryon once in the head, causing him to fall to the ground and strike his head on the concrete parking lot. Lonnie stated that because Bryon was "knocked out," they were reluctant to leave him on the ground. Thus, he and Luke lifted Bryon into the bed of Luke's truck. Both Luke and Lonnie testified that although Bryon was unconscious, he *603 was still breathing and appeared to be all right.
Later that night, Bryon's father returned to the bar to check on his son. Mr. Landry found Bryon passed out in the back of Luke's truck and assumed he had too much to drink. With the assistance of Luke and Lonnie, Mr. Landry put Bryon into his vehicle and drove him home. Mr. Landry was unable to remove Bryon from the vehicle so he left him there until the next morning, at which time Bryon was able to walk with assistance. After several days of vomiting and headaches, Bryon went to the emergency room at Lady of the Sea Hospital in Galliano for treatment. Tests revealed a skull fracture and a hematoma on the brain. Bryon was immediately sent to Thibodaux Regional Medical Center where he underwent brain surgery for removal of the hematoma. Following surgery, Bryon remained in the hospital for eight days and then later returned to his home in Florida with his wife.
Even after his recovery, Bryon was unable to return to his former employment as an engineer in the marine industry. Bryon testified his treating neurologist advised him that he could never return to his previous employment. Following this incident, Bryon began receiving social security disability benefits. As a result of his brain injury, Bryon was left with permanent neurological deficits, including loss of taste and smell, memory loss, and multiple personality changes. He also suffers from a seizure disorder and still has seizures on a weekly basis.
On November 18, 1996, Bryon filed the instant suit for damages, naming Luke as defendant. The matter proceeded to trial on July 23, 1999, at which time the parties agreed to hold the record open for the deposition of Lonnie Bell. After the deposition was submitted in February 2000, the trial court took the matter under advisement. In a judgment rendered on April 27, 2000, the trial court found in favor of Bryon and awarded $744,278.41 in damages. The court noted that although Bryon started the confrontation by his insults directed to Luke when the two were drinking in the bar, Luke became the aggressor when he "invited" Bryon outside, rather than simply leaving the bar or complaining to the bar's owner about Bryon's conduct. The court concluded that Luke "used force totally unnecessary under the circumstances" and was not acting in self-defense when he committed a battery on Bryon.
It is from this judgment that Luke has appealed, assigning the following specifications of error:
1. The trial court erred in finding that Bellanger was the aggressor.
2. The trial court erred in failing to find that there was a battery, since Landry consented to the contact.
3. The trial court erred in failing to find that Bellanger acted in self-defense and with reasonable force.
4. The trial court [erred in failing to] apportion fault to Landry.
5. The trial court erred in not assigning fault to Landry's parents for failing to promptly seek medical attention for their son.

STANDARD OF REVIEW
The Louisiana Constitution of 1974 provides that the appellate jurisdiction of the courts of appeal extends to both law and facts. La. Const., art. V, § 10(B). A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La.1993).
*604 For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel that its own evaluations and inferences are as reasonable. Id.

ANALYSIS

Tort Liability
On appeal, Luke contends that he was not the aggressor and that there was no battery or intentional tort committed because Bryon consented to and voluntarily participated in the fight. He argues further that he acted in self-defense and with reasonable force when he struck Bryon with a single punch. Luke asserts that his actions did not constitute excessive force; and thus, the trial court's judgment must be reversed. For the reasons set forth below, we find Luke's arguments regarding these issues to be without merit.
Tort liability in Louisiana is based on La. Civ.Code art. 2315, which provides, in pertinent part, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." A battery is defined as an intentional offensive conduct with another person without that person's consent. Caudle v. Betts, 512 So.2d 389, 391 (La.1987). In a civil battery case, the burden of proof is on the plaintiff to establish that a battery was committed. Frazer v. St. Tammany Parish School Board, 99-2017, p. 8 (La.App. 1 Cir. 12/22/00), 774 So.2d 1227, 1234, writ denied, XXXX-XXXX (La.3/23/01), 787 So.2d 1001.
Louisiana's aggressor doctrine precludes tort recovery where the plaintiff acts in such a way as to provoke a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff, unless the person retaliating has used excessive force to repel the aggression. Baugh v. Redmond, 565 So.2d 953, 958 (La.App. 2 Cir.1990). Moreover, when a person voluntarily participates in an altercation, he may not recover for any injuries incurred, unless force in excess of that necessary is used and its use is not reasonably anticipated. The use of unnecessary and unanticipated force vitiates the consent. Andrepont v. Naquin, 345 So.2d 1216, 1219-1220 (La. App. 1 Cir.1977).
The issues of which party was the aggressor and whether excessive force was used in repelling the attack are questions of fact that must be determined from the peculiar facts and circumstances of each case. Tripoli v. Gurry, 253 La. 473, 478, 218 So.2d 563, 564-565 (1969). Under Article 2315, the proper standard to evaluate a defendant's action is whether the conduct was that generally required of a reasonable man under like circumstances. See La. Civ.Code art. 2315; Robinson v. Dunn, 96-0341, p. 5 (La.App. 1 Cir. 11/8/96), 683 So.2d 894, 897, writ denied, 96-2965 (La.1/31/97), 687 So.2d 410. Various factors relied upon by the courts to *605 determine the reasonableness of the actions of the party being attacked are the character and reputation of the attacker, the belligerence of the attacker, a large difference in size and strength between the parties, an overt act by the attacker, threats of serious bodily harm, and the impossibility of a peaceful retreat. Slayton v. McDonald, 29,257, p. 6 (La.App. 2 Cir. 2/26/97), 690 So.2d 914, 918.
In the instant case, the trial court made the following findings in written reasons for judgment:
In this case, the plaintiff clearly started the confrontation by his insults directed to the defendant when the two were drinking in the bar. The plaintiff was very intoxicated, and he continued to insult and malign the defendant despite the defendant's repeated requests that he stop. According to the defendant, the plaintiff threatened to "whip his ____," but there is no corroboration of that threat. There was no testimony that the plaintiff at any time inside the bar attempted to hit or push the defendant or that he attempted to provoke a physical situation with the defendant. What is clear from the evidence, including the testimony of the defendant, is that the defendant suggested the two step outside to resolve their differences. From the testimony, the plaintiff was about 90 pounds heavier than the defendant on the day of the incident. When they went outside, the defendant said that plaintiff "got in his face" and pushed him with his chest. Defendant then struck one blow to the face of the plaintiff, dropping him to the parking lot.
The plaintiff was obviously the more intoxicated of the two. The defendant could have easily avoided any confrontation by leaving the bar or by complaining to the owner about the plaintiff's conduct. Instead, he "invited" the plaintiff outside. At that point, the defendant became the aggressor. He used force totally unnecessary under the circumstances. He obviously invited the plaintiff outside so that he could gain some measure of satisfaction for the verbal abuse he had endured inside the bar for most of the evening. The law does not excuse the defendant's actions under these circumstances. He committed a battery on the person of the plaintiff, and he was not acting in self defense.
Thus, the trial court concluded that Luke became the aggressor when he "invited" Bryon outside and then used force totally unnecessary under the circumstances. Although this court might believe its inferences from the facts are more reasonable than the trial court's, reasonable inferences of fact should not be disturbed on review when the record supports the trial court's findings. The trial court was in the better position to evaluate the testimony and resolve the conflicting testimony concerning the fight in favor of Bryon. Even if this court were to reverse the finding as to who was the aggressor and conclude that Bryon voluntarily participated in the altercation, the fact remains that the record contains sufficient support for the trial court's finding that Luke used excessive force. Use of such force under the facts and circumstances of this case was unreasonable, and, as set forth in Andrepont, supra, vitiates Bryon's consent. Based on our review of the record in this matter, we are satisfied that a reasonable factual basis exists for the trial court's findings in this regard.

Allocation of Fault
On appeal, Luke argues that the trial court erred in failing to reduce Bryon's recovery by his own fault in contributing to his injuries. Further, Luke contends that Bryon's parents contributed to his *606 injuries by not seeking medical treatment for their son until two days after the incident. Because there is absolutely no evidence in the record to support Luke's claim that Bryon's parents contributed to their son's injuries, this argument is without merit and does not warrant any further discussion. Therefore, our discussion will focus on the allocation of fault between Bryon and Luke.
The trial court applied La. Civ. Code art. 2323 in declining to consider Bryon's fault in determining his damages. Article 2323 provides for comparative fault as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
However, article 2323(C) applies only in cases where the plaintiffs contributory fault consists of negligence. It does not apply where the plaintiff's fault is intentional in nature. See Clark v. Burchard, 2000-2750, p. 15 (La.App. 4 Cir. 11/14/01), 802 So.2d 824, 834.
In Babb v. Boney, 30,443, p. 6 (La.App. 2 Cir. 4/08/98), 710 So.2d 1132, 1134, the second circuit held that some of its prior cases using a comparative fault analysis in battery cases where there was provocation on the part of the victim could be viewed as a comparison of the intentional conduct on the part of both parties. The court reviewed its prior rulings, noting as follows:
Prior rulings of this circuit have recognized that there may be certain conduct which, while not justifying the battery complained of, may be of such a nature under the circumstances to have provoked or contributed to the incident. See Thigpen v. Stern, 503 So.2d 1050 (La.App. 2d Cir.1987); Walpole v. Weathersby, 465 So.2d 950 (La.App. 2d Cir.1985); Downey v. Clark, 426 So.2d 331 (La.App. 2d Cir.1983). In these cases we held that the plaintiffs damages should be "mitigated" or reduced. Also, in Robinson v. Hardy, 505 So.2d 767 (La.App. 2d Cir.1987), writ denied 508 So.2d 825 (La.1987) and in our earlier ruling in Harris v. Pineset, 499 So.2d 499, (La.App. 2d Cir.1986), writs denied 502 So.2d 114 and 117 (La.1987), we applied the comparative fault guidelines established by the Supreme Court in Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985) to reach the same result as our earlier "mitigation" jurisprudence, i.e., a reduction of the damages recoverable *607 by a battery victim where the victim's behavior provoked the attack.
Babb, 30,443 at 4-5, 710 So.2d at 1134.
In written reasons for judgment, the trial court acknowledged Bryon's assaultive and provocative behavior while in the bar. Nonetheless, the court concluded that Bryon's acts were negligent, thus, having no effect on Luke's liability. The court noted as follows:
Certainly, the plaintiff's actions leading up to the physical confrontation between the parties were significant in determining the cause of his injuries and damages. Initially, his actions, the insults directed to the defendant, prompted the defendant to call him outside. Prior to the amendment to LA Revised Civil Code Article 2323 on comparative fault, the plaintiff's negligence could be used to mitigate and reduce the damages claimed from the intentional tort of the defendant. The amendment to this article, in Paragraph C, effective just weeks before this incident occurred, provides that the claim for damages by a person injured partly by his own negligence and partly by an intentional tortfeasor shall not be reduced. Therefore, the plaintiff's actions can have no effect on the liability of the defendant and the damages due to the plaintiff as a result of the defendant's liability.
Based on our review of the record and prior jurisprudence concerning this issue, we conclude that the trial court erred in refusing to apportion fault in accordance with Article 2323. As noted by the trial court, we agree that Bryon's actions "leading up to the physical confrontation between the parties were significant in determining the cause of his injuries and damages." More importantly, though, we find that these "significant" acts were intentional, not negligent, thus warranting a comparative fault analysis. After a thorough review of the evidence before us, we conclude that fault should be apportioned equally between Bryon and Luke.

Loss of Future Earnings
The final argument raised by Luke is that the trial court erred in awarding Bryon $200,000.00 for loss of future earnings. Luke contends that the award is without any evidentiary support, is merely speculative, and must be reversed. We agree.
In written reasons for judgment, the trial court noted as follows on the issue of loss of future earnings:
The plaintiff did not present any expert testimony on the issue of loss of wages, in the past and in the future. The plaintiff did state that he was earning $40,000 per year at the time of the incident. He has not worked since the accident, and, therefore, his loss of income from June 1996, to the trial, just over three years later, totals $120,000.00, and that amount should be awarded as [an] item of damage. Even without expert testimony, the Court can award a sum of loss of future earnings and earning capacity, and that amount, based on the evidence and testimony, should be in the sum of $200,000.00.
An award for loss of future earning capacity is not predicated only on the difference between a person's earnings before and after the disabling injury. It also encompasses the loss of the person's earning potential or capacity, that is, the loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience, and for which he may be recompensed. Morris v. State, Department of Transportation, 94-2545, p. 10 (La.App. 1 Cir. 10/6/95), 664 So.2d 1192, 1198, writ denied, 95-2982 (La.2/9/96), 667 So.2d 537. Although lost future earnings do not have to be proven to a mathematical *608 certainty, a plaintiff must present evidence that proves a loss of earning capacity has, in fact, been sustained. Bell v. Ayio, 97-0534, p. 13 (La.App. 1 Cir. 11/13/98), 731 So.2d 893, 903, writ denied, 98-3115 (La.2/5/99), 738 So.2d 7.
In Bell, this court vacated the award for loss of earning capacity, concluding that there was no evidence of same presented at trial. In the instant case, the only evidence concerning loss of earning capacity came from Bryon. He testified that at the time of this incident, he was working as an engineer and earning approximately $40,000.00 yearly. When asked at trial if he was still working as an engineer, the following colloquy occurred:
Q. And since this incident and surgery have you been able to return to your job [as an engineer]?
A. No, sir.
Q. Could you function in that job today?
A. No. I can never go back. I was warned by both the neurosurgeons that I couldn't probably never go back to work offshore again.
This is the only testimony from Bryon concerning his loss of future earnings. There was absolutely no evidence presented that Bryon was totally disabled from working in any capacity. While we acknowledge that Bryon has been left with some residual physical problems following this incident, his condition is not such that he will be permanently unable to work. Although he may not be physically able to return to work as an engineer offshore, there is no evidence that he can never again work as an engineer or in some other capacity. There was no factual basis for the award, and it was based on pure speculation. Thus, that portion of the trial court's judgment awarding Bryon $200,000.00 in loss of future earnings is vacated.

CONCLUSION
For the above and foregoing reasons, the trial court's award of $200,000.00 for loss of future earnings is vacated, as there is no evidence in the record to support same. The judgment of the trial court is reversed insofar as it does not allocate any fault to Bryon for his actions in contributing to his injuries. Moreover, the judgment is amended to reflect the following allocation of fault: 50 percent to Bryon and 50 percent to Luke. Accordingly, Bryon's damage award is reduced to $544,278.41, to reflect the reversal of the award for loss of future earnings. The award is further reduced by Bryon's percentage of fault for a total award of $272,139.20. All costs associated with this appeal are to be assessed equally against the parties.
VACATED IN PART; REVERSED IN PART; AMENDED, AND AS AMENDED, AFFIRMED.
FOIL, J., concurs in part and dissents in part and would affirm the trial judge.
FOGG, J., dissents and assigns reasons.
FOGG, J. Concurs in Part and Dissents in Part.
I respectfully dissent in part. It is undisputed that the plaintiff started this confrontation with insults, then willingly went outside with the defendant and struck the first blow by pushing the defendant with his chest. Clearly, the plaintiff voluntarily participated in the altercation. The defendant responded with one blow to the plaintiff's face with a partially closed fist. I believe the action of the defendant did not constitute the use of excessive force. Furthermore, it is unreasonable to conclude that the use of such force was unanticipated by the plaintiff. Therefore, I would *609 reverse the judgment of the trial court, finding no fault on behalf of the defendant.
NOTES
[1] Judge William F. Kline, Jr., retired, and Judge Philip C. Ciaccio, retired, are serving as judges pro tempore by special appointment of the Louisiana Supreme Court.