861 So.2d 603 (2003)
Ronnie G. CLARK
v.
The STATE of Louisiana, The DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, The Louisiana State Police, Lieutenant Michael Sunseri, Sergeant William Dorris, ABC Insurance Company and DEF Insurance Company.
No. 03-CA-0455.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 2003.
*604 Rodney Kelp Littlefield, Regan & Associates, New Orleans, LA, for Plaintiff/Appellant.
Edmund W. Golden, David K. Gatto, Golden & Fonte, Metairie, LA, for Defendants/Appellees.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and SUSAN M. CHEHARDY.
SOL GOTHARD, Judge.
Plaintiff, Ronnie G. Clark, appeals an adverse judgment of the trial court in this personal injury suit against the State of Louisiana, through the Department of Public Safety and Corrections (D.P.S. & C.), and the Louisiana State Police (L.S.P.), as well as two Louisiana State Police Officers individually, and various insurance companies. Mr. Clark was seriously injured when he was shot by State Troopers as he tried to run a roadblock set up to stop him on Interstate-10 in St. Charles Parish on March 19, 1994.
Defendants, D.P.S. & C., L.S.P., and both State Troopers, Sergeant William Dorris and Lieutenant Michael Sunseri, filed answers in which they asserted six affirmative defenses including qualified immunity, comparative fault, self-defense and, defense of others. Charity Hospital and Medical Center of Louisiana at New Orleans (Charity), filed a petition of intervention seeking to recover $21,475.16 in medical services and supplies rendered to plaintiff.
For several years the parties conducted extensive discovery that included expert reviews and analysis of the incident. A nine-day trial on the merits was conducted in October 2002, after which the trial court took the matter under consideration. On November 8, 2002, a judgment, with extensive reasons supporting it, was rendered by the trial court. In the judgment the trial court found in favor of the defendants, and dismissed the plaintiff's action with prejudice. It is from that judgment that plaintiff appeals.
In brief to this court, plaintiff assigns two errors that assert errors in findings of law and of fact. Plaintiff first argues that *605 the trial court erred in applying the aggressor doctrine to bar recovery by Ronnie Clark. In the second assignment, he argues that the trial court "failed to consider whether it was objectively reasonable for Lt. Sunseri to fear for his life at the time he fired the shot which struck Ronnie Clark in the back." Because findings of fact support findings of law, we will review the assignment as to the findings of fact first.
This is an extensive record. There are volumes of testimony, expert witness reports and documentation offered by both parties. However, the general facts that are not in dispute are that plaintiff, Ronnie Clark, was riding a motorcycle at a high rate of speed eastbound on I-10 through St. Charles Parish. He was observed by Louisiana State Trooper Terrence Freese. Trooper Freese clocked Mr. Clark traveling at speeds of up to 120 MPH. The Trooper activated his emergency lights and sirens and pursued Mr. Clark in an attempt to stop the vehicle. Mr. Clark spotted the State Trooper, but did not stop or slow down. During the pursuit, Trooper Freese observed a handgun tucked into the back of Mr. Clark's belt. Believing that the motorcyclist would use the weapon, Trooper Freese pulled to a safe distance behind the motorcycle. Trooper Freese broadcast his observations to other officers in the area to get help in the arrest and to warn that the motorcyclist was armed. A second trooper, Richard Reggio, joined in the chase and observed Mr. Clark traveling at a high rate of speed in the center of the two-lane highway, forcing motorists off the roadway.
Two other troopers, Lieutenant Michael Sunseri and Sergeant William Dorris, who were in separate cars heard the broadcast and teamed up to set up a road block at the intersection of I-10 and I-610 to stop the armed motorcyclist. Traffic was stopped and the two marked vehicles were parked in the roadway, leaving only the north shoulder of the roadway passable. Sgt. Dorris armed himself with a 9mm automatic pistol, and positioned himself in the center of the right lane of the roadway. Lt. Sunseri stood on the north shoulder of the road armed with a departmental 12 gauge shotgun. Traffic stopped by the roadblock began to pile up, obstructing the troopers' view of the roadway. However, Lt. Sunseri saw the motorcycle approaching the stopped traffic. The vehicle turned onto the shoulder and began passing the stopped traffic. Lt. Sunseri called to his partner to tell him of the approaching motorcycle. Sgt. Dorris stood on the shoulder of the road waving his hands. Instead of stopping the motorcycle, Mr. Clark crouched down and attempted to continue on past the roadblock. Both troopers fired at Mr. Clark hitting him several times and causing serious injuries including a spinal injury that left Mr. Clark a paraplegic.
The troopers maintain that as Mr. Clark approached the roadblock, he crouched down, gunned his motor and came straight for Lt. Sunseri, attempting to kill him. It was at that time that both officers discharged their weapons to protect Lt. Sunseri's life. Plaintiff admits that he did not stop for the roadblock, but denies any attempt to kill either Trooper and maintains that the officers shot at him after he was past the roadblock and had eluded their capture. Thus, Mr. Clark argues it was error to find that Lt. Sunseri thought his life was endangered.
To address this assignment of error we must review the testimonial and documentary evidence introduced at trial. We begin with the testimony of Lt. Sunseri. He testified that he had been with the Louisiana State Police since 1973, had risen to the rank of Lieutenant in 1987, and was *606 the executive officer for Troop B. He is a specialist in traffic accident reconstruction and has taught many classes of state troopers on that subject.
Lt. Sunseri began his narrative of the events of March 19, 1994 by explaining that he was on his way to meet Sgt. Dorris for lunch at a restaurant in Metairie when he received a call from a fellow trooper who told him troopers in St. John Parish were in pursuit of a motorcyclist speeding in excess of 100 mph on I-10. Lt. Sunseri switched to the live radio channel to hear the details. He heard that the suspect was driving erratically and forcing motorists off the road, and that troopers in pursuit saw a gun, tucked into his belt in the small of his back, when his shirt blew up. Lt. Sunseri also heard the troopers say that they perceived the gun to be a 9mm pistol, and that the suspect had reached back on at least two occasions to grab the gun.
Lt. Sunseri stated that at that time he knew that a motorcyclist was traveling at a high rate of speed, forcing other motorists off the road and brandishing a gun. This, he understood was a very dangerous situation. Consequently, he and Sgt. Dorris, who was following behind in a separate vehicle, drove westbound on I-10, and decided to set up a roadblock at the intersection of I-10 and I-310. Sgt. Dorris got to the roadblock point first and parked his vehicle across some of the right lane and the shoulder of eastbound I-10. When Lt. Sunseri arrived, he positioned his car across part of the right and part of the left lane. Lt. Sunseri explained that it is standard operating procedure when setting up a roadblock to leave open an avenue of apprehension or escape. Accordingly, the shoulder of the left lane was not blocked.
Lt. Sunseri got out of his vehicle and got a shotgun out of the trunk of his vehicle. Both troopers walked around trying to see the motorcyclist coming. Lt. Sunseri's vision was obstructed by an 18-wheeler and a camper trailer stopped by the roadblock; so to gain a better vantage point, Lt. Sunseri backed away from the police vehicles along the open escape route, which was located on the shoulder of the left lane. At that point Lt. Sunseri did not know the exact location of the motorcyclist, but he was still monitoring his radio and knew that the cyclist was heading toward the roadblock.
Shortly afterward Lt. Sunseri, who was dressed in his Louisiana State Trooper uniform, stood in the left shoulder with his shotgun pointing skyward. He spotted the cyclist coming out from the line of stopped vehicles in the left lane and on to the shoulder. Lt. Sunseri estimated the cyclist's speed to be about 60 mph at that point and about 200 yards away. Lt. Sunseri began waving to make sure that the cyclist saw him. Because the cyclist continued toward him, Lt. Sunseri began to yell and continued waving. He also contacted Sgt. Dorris on the radio to notify him that the cyclist was approaching. The cyclist crouched down on the motorcycle and sped up as he neared Lt. Sunseri. At that moment one of the other troopers said, "He's got a weapon!" The cyclist continued coming straight at Lt. Sunseri, so Lt. Sunseri fired his weapon. As he jumped out of the way, Lt. Sunseri fired his weapon again. The cyclist continued on, and Lt. Sunseri, believing he had missed the cyclist, ran over to his vehicle. When he saw that Sgt. Dorris was not leaving the scene in pursuit, Lt. Sunseri realized that the cyclist was down further up the roadway. Sgt. Dorris called for emergency medical help and the troopers went over to the suspect. The cyclist was lying on the ground, nearby was a hand gun and several rounds of ammunition. *607 Sgt. Dorris moved the gun out of reach of the suspect.
Lt. Sunseri got names of witnesses to the shooting who were among the drivers stopped by the roadblock and then returned to where Sgt. Dorris was watching over the suspect until medical help arrived. Lt. Sunseri described Clark as "out of control" and testified that Clark was "yelling and cursing and saying why didn't we kill him." By that time the two troopers who were in pursuit of Clark arrived on the scene. One of the troopers, Freese, picked up Clark's gun. It was unlocked, had a round of ammunition in the chamber, and was cocked.
Lt. Sunseri testified that Clark was "going to kill me." Clark was coming towards the trooper and was accelerating. Lt. Sunseri heard one of the troopers yell, "he's got a weapon," and at that point Lt. Sunseri testified that his thought was, "I'm not going home tonight." That's when he fired the first shot. Then, as he jumped out of the way of the speeding motorcycle to save his life, Lt. Sunseri fired a second shot. Lt. Sunseri testified that he fired both shots low to avoid hitting an innocent motorist stopped by the roadblock.
Lt. Sunseri also testified that Sgt. Dorris fired three shots, which were almost simultaneous with Lt. Sunseri's shots. Lt. Sunseri explained that a total of five shots were fired, and it was one event happening quickly as Clark approached and passed Lt. Sunseri. According to Lt. Sunseri's testimony, no shots were fired after Clark passed Lt. Sunseri. Lt. Sunseri explained that when he fired the first shot, Clark was right in front of him. Then as Lt. Sunseri jumped out of the way and Clark was right next to him, the trooper fired the second shot. Lt. Sunseri also stated that he had a difficult time getting out of the way because after the first shot, Clark jumped and swerved and almost lost control of the motorcycle.
The testimony of Lt. Sunseri continued and throughout his recitation of the events of that day, he reiterated his conviction that Clark was intentionally heading his motorcycle directly at him, causing Lt. Sunseri to fear for his life. When the motorcyclist passed Lt. Sunseri, the estimated speed was 30 to 40 mph, and the trooper testified that as he jumped out of the way he was close enough to touch the rider. He also testified that he stopped shooting as soon as the rider passed him and the danger had passed.
Lt. Sunseri also testified that there were two independent investigations of the shooting made by his office and the St. Charles Sheriff's Office. Both he and Sgt. Dorris had to testify before the State police shooting review board, which ruled the shooting justified.
Lieutenant William Dorris, who was a sergeant at the time of the accident, also testified at trial. His testimony regarding how he and Lt. Sunseri heard about the dangerous condition on I-10, and how they set up the roadblock in an effort to stop the motorcyclist, corroborated that of Lt. Sunseri.
Lt. Dorris stated that by monitoring radio transmissions, he heard from fellow officers in pursuit of the cyclist that the suspect was armed and reached for the gun several times. Lt. Dorris explained that he knew there was a reckless motorcyclist fleeing from police at a high rate of speed. That person had a handgun in his waist band and had reached for it on several occasions. Lt. Dorris' assessment of the situation was that the suspect was armed and dangerous, and would attempt to get away from police even if it was necessary to use his gun.
*608 Lt. Dorris testified that when the roadblock was set up, he got out of his car, armed himself with a 9mm handgun, and walked in the opposite direction from where Lt. Sunseri walked because he was unsure on which side of the highway the cyclist would approach the roadblock. He explained that the roadway was curved away from his view and as traffic began piling up, he could not see past about the third vehicle. Therefore, Lt. Sunseri spotted the cyclist first and notified the other officers over the radio. Lt. Dorris started over to where Lt. Sunseri was standing on the north side of the roadway. Lt. Sunseri was standing on the shoulder of the road waving one hand and holding a shotgun in the other. The shotgun was pointed in the air. Lt. Sunseri explained that these events happened quickly, and before he could get to the other side of the roadway the cyclist was approaching. He was riding in a crouched down position and appeared to be traveling at a high rate of speed. He did not appear to be slowing down, and even may have been accelerating, heading directly for Lt. Sunseri. Lt. Dorris stated that it was at that moment he made the decision to shoot the driver to save Lt. Sunseri's life. Lt. Dorris stated he believed the cyclist's intention was to "run over Lt. Sunseri to avoid apprehension in any manner that he could." Lt. Dorris said that he shot three times as the motorcycle cleared the first car stopped by the roadblock. Lt. Dorris stated that it all happened in a split second.
There were several motorists, stopped at the roadblock, who witnessed the incident, including Carl and Mona Roussel. The Roussels were returning to Metairie after a day of golf in LaPlace. Their vehicle was the first to be stopped by the roadblock. They were in the right lane and observed the incident. They saw Mr. Clark riding his motorcycle at a high rate of speed directly through the roadblock. Mr. Roussel testified that he was looking straight ahead and saw Lt. Sunseri fire his shotgun after the motorcycle passed. He only heard the other shots fired by Lt. Dorris. Mrs. Roussel also stated that she thought the officers shot after the motorcycle "zipped" by.
Jonathan Todd Cole testified that he was driving a 1994 Pontiac Trans Am from Baton Rouge to New Orleans when he was stopped by the roadblock. He stated his was the first vehicle to be stopped by the roadblock in the left lane. Mr. Cole saw the motorcycle approaching from behind on the shoulder of the road. The cyclist accelerated as he got closer to the roadblock. The troopers began to shoot at the cyclist as he passed and continued to fire their weapons even after the cyclist had passed. Mr. Cole maintained that neither of the troopers was in danger of being hit by the cyclist as he passed.
Susan and Lehman Davis, who were also traveling from LaPlace to New Orleans, stated that they were in the first car in the left lane of travel at the roadblock. They both testified at trial.
Mrs. Davis refuted the testimony of Jonathan Todd Cole that his was the first car in the left lane. She stated she saw Lt. Sunseri, with a shotgun in his hand, standing with at least one foot on the shoulder of the road. The motorcycle came up on the left shoulder. As he passed the car behind the Davis vehicle, the motorcycle rider hunched down and sped up. Lt. Sunseri was waving and screaming. He had a shotgun, pointed to the sky, in one hand. The officer lowered his shotgun, aimed low, and fired at the cyclist. Mrs. Davis recalls thinking that the cyclist was going to hit the officer. The officer jumped out of the way at the last second and shot a second time. Mrs. Davis stated that her impression was that *609 the officer was shooting low trying to hit the motorcycle, not the rider. When Lt. Sunseri fired his weapon the second time, the motorcyclist was about even with him. Mrs. Davis stated emphatically there is no doubt in her mind that at the time of the first shot, the motorcycle was still ahead of the officer, and that if the officer had not moved out of the way, he would have been hit by the oncoming motorcycle.
Mr. Davis verified that his vehicle, rather than Mr. Cole's, was first in line in the left lane of the roadblock. He first saw the motorcycle out of his side view mirror coming up the shoulder of the road. Lt. Sunseri was on the shoulder of the road, holding his shotgun with the muzzle pointed up. Mr. Davis saw the officer waving and trying to flag down the cyclist. Lt. Sunseri lowered his weapon, pointed it down the shoulder of the road and shot. Mr. Davis stated he felt some of the pellets hit the tire of his vehicle. Mr. Davis testified that the motorcycle was about to run over the officer who was trying to get out of the way. That's when Mr. Davis heard a second shot. Mr. Davis explained that everything happened very fast because of the speed of the oncoming motorcycle.
Mr. Randolph Peidrahita, who was returning to New Orleans after a visit with his parents in Baton Rouge, testified that he was traveling eastbound on I-10 when a speeding motorcycle almost ran him off the road in St. John the Baptist Parish. At that time, Mr. Peidrahita estimated the speed of the motorcycle to be about 90 mph. After the motorcycle passed, Mr. Peidrahita observed a gun tucked into the back waistband of the rider's pants. Mr. Peidrahita continued on and was the second car in the left lane of traffic stopped at the roadblock. He also testified that the motorcycle came up the left shoulder, accelerated and headed for the trooper standing there trying to flag the cyclist down. Mr. Peidrahita recalled hearing one shot fired at that time. He was sure the motorcycle was in front of the officer when the shot was fired, although he could not estimate how far.
The court also heard testimony from plaintiff, Ronnie Clark, who stated that he was living with his father in Texas in March of 1994. He left Texas on March 18th, armed with a handgun, to travel to Florida. He explained that he was on probation as a result of a DUI he received in Florida. He got a message from his patrol officer in Florida that it was urgent to return the call. Because he could not reach his parole officer by phone, he was traveling back to Florida.
Mr. Clark said that before the incident on March 19, 1994, he was in excellent health. After the shooting, Mr. Clark was taken to Charity Hospital in New Orleans where a shotgun pellet was removed from his spine. The shooting by state troopers at the roadblock left him paralyzed from the waist down. When questioned about the facts of the shooting, Mr. Clark admitted that his statement in his deposition, which indicated he raised his hands and came to a stop at the roadblock, could have been wrong. He stated at trial that the aftermath of the treatment at the hospital caused his memory of that day to be "mixed up." He explained that, while in the hospital, he was given Demerol and other pain relieving drugs and he was having nightmares about the shooting. However, after sitting through the trial and hearing the testimony of eyewitness accounts of the events of March 19th, he now believes that he did not stop at the roadblock, but continued directly through it at a high rate of speed. It does not appear that Mr. Clark has an independent memory of the shooting. He simply stated that he could not disagree with testimony that he tried to aim his motorcycle at *610 Lt. Sunseri as the officer stood on the shoulder of the road waving and trying to get him to stop.
Thomas Donner, M.D., a board certified neurosurgeon and plaintiff's treating physician, testified at trial. Dr. Donner stated that Mr. Clark had gunshot wounds to the chest and back. Dr. Donner stated that x-rays showed metal fragments of pellets in the central canal of the lower thoracic spine, which is consistent with the entry wound at the lower back of a motorcyclist in a crouched position. Mr. Clark also had an entry wound on his left side. The wound to the spinal cord ultimately resulted in paralysis in the lower part of the body.
The record also contains volumes of expert testimony and documents opining on the trajectory of the bullets and the effect of any possible factors, which would show where the motorcyclist was in relation to the troopers when the shooting occurred. In the reasons for judgment the trial court stated:
...... The Court heard testimony from a total of twenty-four witnesses (14 fact and 10 expert witnesses) and reviewed over seventy-five separately identified trial exhibits (including numerous photographs, diagrams, sketches, scientific journal articles, deposition testimony, shooting test results, and physical evidence.)
This court has also considered all of the extensive evidence in this case to review the findings of fact made by the trial court. It is well settled that our review of the factual findings made by the trier of fact is based on an abuse of discretion or clearly wrong standard, Rosell v. ESCO, 549 So.2d 840 (La.1989). Recently this court summarized the law regarding our review of a factual finding in Griffin v. Kurica, 03-190 (La.App. 5 Cir. 6/19/03), 850 So.2d 807, 811, as follows:
There is a two-part test for the reversal of a factfinder's determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
An appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.
Where there is conflict in the testimony, reasonable determinations of credibility and reasonable inferences of fact should not be disturbed on appeal.
The reasons for these well-settled principles of review are not only the trial court's better capacity to evaluate live witnesses, as compared to the appellate court's access only to a cold record, but also the proper allocation of trial and appellate function between the respective courts.
Id. (citations omitted)
Given the testimony and documentary evidence presented at trial, we do not find that the trial court erred in its factual finding that Lt. Sunseri was in fear for his life when he shot plaintiff. Accordingly, we find no merit in plaintiff's assignment of error regarding the factual findings of the court.
Having settled the issue of fact presented for our review, we will now consider the law used by the trial court in the judgment.
As previously stated, the trial court gave extensive and very thoughtful reasons for judgment. The court concluded that the troopers committed an intentional tort against Mr. Clark, but were justified in *611 their use of force due to the circumstances. The trial court began with a statement of the query as follows:
From this comprehensive record, the Court must determine whether the shooting of Ronnie G. Clark was an appropriate response in light of the danger faced by Lt. Sunseri and/or Sgt. Dorris, or instead constituted an unjustified use of deadly force that warrants a judgment of liability against the defendants.
After making findings of fact, which we find are well supported by the record, the trial court found that this was not an accidental shooting, but rather an intentional tort. The court further found that the troopers did not fire their weapons in an attempt to affect an arrest, but to defend themselves from harm. The trial court stated:
As in criminal cases, the defendants' assertions of self-defense and defense of another are considered affirmative defenses or privileges to an intentional tort claim. Both defenses operate on the principle that where force (even deadly force) appears reasonably necessary to defend oneself from a real or reasonable perceived attack by another, then such force is justified.
In their post-trial argument, the defendants refer to the `aggressor doctrine', which essentially involves the same concept. The `aggressor doctrine' jurisprudence holds that a plaintiff is barred from recovery when his actions are such that they provoke a reasonable person to use physical force in fear of or anticipation of perceived injury. The `aggressor doctrine', however, does not bar recovery where a defendant uses excessive force to repel or subdue the initial aggression by a plaintiff.
The trial court continued on to explain that the burden of proof in affirmative defense issues rests on the defendant raising the defense. Ultimately, after applying the facts to the legal concepts, the trial court concluded that:
...... plaintiff, Ronnie Clark was the aggressor on March 19, 1994, that his actions placed Lt. Michael Sunseri in reasonable fear of death or great bodily harm, that his actions gave Sgt. William Dorris reasonable fear that a fellow law enforcement officer was in danger of death or great bodily harm, and that the use of deadly force by both Lt. Sunseri and Sgt. Dorris was reasonably necessary under the circumstances.
In the other assignment of error, it is asserted that the trial court erred in relying on the aggressor doctrine to determine Ronnie Clark was barred from recovery. Plaintiff argues that the aggressor doctrine has been abolished in Louisiana law because an absolute bar to recovery against a provoking plaintiff cannot exist in a pure comparative fault state.
In defense of his argument plaintiff cites Landry v. Bellanger, 02-C-1443 (La.5/20/03), 851 So.2d 943. In Landry, an intoxicated bar patron (Landry) made hostile and belligerent remarks and gestures to another bar patron (Bellanger) with whom he had been drinking. When Landry's actions became more aggressive and threatening, Bellanger struck plaintiff in the head with a partially closed fist causing plaintiff to fall backwards and hit his head on some concrete. Landry sued for personal injury and received a judgment against Bellanger. On appeal the First Circuit found that the trial court erred in refusing to apportion fault in accordance with La. C.C. art. 2323(C). The appellate court reasoned that Landry's actions in provoking the incident were intentional rather than negligent; therefore, they warranted a comparative fault analysis. The appellate court found fault should be equally proportioned between the parties. *612 Landry v. Bellanger, 00-2029 (La.App. 1 Cir. 3/28/02), 813 So.2d 598. Bellanger filed a writ application with the Louisiana Supreme Court that was granted. Landry v. Bellanger, 02-C-1443 (La.5/20/03), 851 So.2d 943.
In their review of the matter, the Supreme Court considered the origins and history of the aggressor doctrine in Louisiana, as well as current law. The Supreme Court concluded that La. C.C. art. 2323(C), relied on by the appellate court, must be read in conjunction with the other sections of that article. Consequently, the Supreme Court concluded:
....... Thus, reading each section of La. C.C. art. 2323 and giving effect to each portion of the Article, we find that the fault of all persons causing or contributing to injury, regardless of the basis of liability, is to be determined, and, if a negligent plaintiff is injured as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced by his percentage of fault.

Landry v. Bellanger, supra. 851 So.2d at 953.
The Supreme Court continues on to explain that the above article does not provide for an instance in which both parties are intentional tortfeasors, ultimately finding that Article 2323(C) is inapplicable.
We find that plaintiff is correct in his statement that the Landry court held the aggressor doctrine is inconsistent with Louisiana's pure comparative fault regime. However, the court also concluded that when the conduct of the defendant constitutes an intentional act, rather than an act of negligence, self-defense can operate as a defense to defendant liability. In that regard the Supreme Court explained in Landry, 851 So.2d at 954-5:
In a suit for damages resulting from an intentional tort, the claimant must carry the burden of proving all prima facie elements of the tort, including lack of consent to the invasive conduct. In turn, the defendant may seek to prove that he is without fault because his actions were privileged or justified, such as self-defense. Self-defense, unlike the aggressor doctrine, is a true defense in that it operates as a privilege to committing the intentional tort. In such a case, a plaintiff's conduct must have gone beyond mere provocation under the aggressor doctrine.
The Landry court reviewed the case de novo, because it found the appellate court made an error of law by the application of negligence principles in Article 2323(C), and concluded that the defendant was not liable under the privilege of self-defense.
La. R.S. 14:19, although a criminal statute, is applicable in civil intentional tort cases. See, Hattori v. Peairs, 95-0144 (La.App. 1 Cir. 10/6/95), 662 So.2d 509; writ denied, 95-2677 (La.1/12/96), 666 So.2d 322. That statute provides that:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or forcible offense or trespass against property in a person's lawful possession; provided that the force of violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
Likewise, La. R.S. 14:22 provides a similar defense for the defense of others.
In applying those principles to the matter before us, we do not find the trial court erred in its finding of law. A careful reading of the reasons for judgment shows that the trial court found both parties to be intentional tortfeasors and, although it used the aggressor doctrine in its analysis, *613 the finding was that the defendants were not liable as a result of the defense or privilege of self-defense and defense of others. That is consistent with the law as it stands now on intentional torts, and is consistent with the facts in this matter. Accordingly, we affirm the trial court's judgment and assess all costs of this appeal to appellant.
AFFIRMED.