[No. G038335. Fourth Dist., Div. Three. July 28, 2008.]

PAUL M. DOUGHERTY, Plaintiff and Appellant, v.
LUCIEN C. HAAG et al., Defendants and Respondents.

COUNSEL

Levin & Oberman, Jeffrey T. Oberman; Law Offices of Arezou Kohan, Arezou Kohan; Golden & Fonte and Edmund W. Golden for Plaintiff and Appellant.

Green & Hall, Brian C. Plante, Eurus Cady, Markus D. Self; Law Offices of Alan E. Wisotsky and Alan E. Wisotsky for Defendants and Respondents.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

This is a "common law right of fair procedure" case. (E.g., *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] (*Pinsker II*); *James v. Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329] (*Marinship*); *Yari v. Producers Guild of America, Inc.* (2008) 161 Cal.App.4th 172 [73 Cal.Rptr.3d 803] (*Yari*); *Oskooi v. Fountain Valley Regional Hospital* (1996) 42 Cal.App.4th 233 [49 Cal.Rptr.2d 769] (*Oskooi*).)

 The right of fair procedure derives, as our high court pointed out in *Pinsker II*, from the common law, and should not be confused with constitutional "due process." (*Pinsker II, supra*, 12 Cal.3d at p. 550, fn. 7.) The right by no means applies to all private organizations, but rather only to those which, in the *Yari* court's useful phrase, act as some sort of "gatekeepers" over the right to practice a lawful trade or profession. (See *Yari, supra*, 161 Cal.App.4th at p. 176, citing *Ezekial v. Winkley* (1977) 20 Cal.3d 267, 272 [142 Cal.Rptr. 418, 572 P.2d 32] (*Ezekial*).)[1]

Typical "gatekeeper" organizations are labor unions (e.g., *Otto v. Tailors' P. & B. Union* (1888) 75 Cal. 308 [17 P. 217] (*Otto*) [expulsion from tailors union]; *Marinship, supra*, 25 Cal.2d 721 [union refused to admit blacks to full membership in union]), professional societies (*Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] (*Pinsker I*) [application for membership in orthodontists' organization]) and

---

[1] The organization in *Yari* itself, an organization of film producers who decide who is eligible to be considered as a "producer" for purposes of the Best Picture Oscar, was determined *not* to be a gatekeeper.

hospitals (*Oskooi, supra*, 42 Cal.App.4th 233 [suspension of doctor's hospital privileges]).

This case, however, concerns a gatekeeper organization of some special interest to the judiciary. The organization here, the Association of Firearm and Toolmark Examiners, or AFTE, exists to promote the integrity of expert testimony in the area of firearms forensics. Provisions in the organization's private code of ethics preclude, among other things, making "unrepresentative, atypical, or unreliable" conclusions from evidentiary materials or "assisting litigants so as to create a false impression."

The plaintiff in this case, Paul M. Dougherty, was censured by AFTE after he gave forensic testimony for state trooper defendants in a Louisiana unreasonable-use-of-force case that his peers in the AFTE determined to be untenable. Dougherty then brought this litigation in Orange County, California, seeking a writ to force AFTE to overturn its censure.

As the record shows, there can be no question that AFTE afforded Dougherty a high level of "fair procedure." He had the chance to explain his theory no fewer than four times: in writing, to an ethics committee, then again, personally, in front of AFTE's board, then again, in writing, in Web postings before a general membership meeting, and yet again, in person, in front of the entire membership at that meeting. In the process of these multiple layers of review, at least two procedural protocols were bent in Dougherty's *favor*: (1) He got extra time to respond to the initial complaint at the ethics committee level (he had missed the initial 30-day deadline) and (2) he got the chance, at the convention, to participate in the voting on his own sanction, which was the reason he was only censured, and not kicked out of AFTE altogether.

The trial judge denied the requested writ. We affirm.

## II. UNDERLYING FACTS

### A. *An Occurrence on the I-10 Causeway in St. Charles Parish, Louisiana, March 19, 1994*

Ronnie Clark was a convicted felon in Florida. He had been residing with his father in Texas and was traveling through Louisiana after being contacted by his Florida probation officer. He was armed with a loaded .45-caliber handgun.

Clark was speeding on his motorcycle, going about 115 miles per hour. A Louisiana state trooper pursued, sirens wailing. Clark refused to pull over. Pursuing officers could see a handgun tucked into his pants.

Clark was on Interstate 10 as it edges along Lake Pontchartrain, heading east toward New Orleans and the Mississippi state line. Two Louisiana state troopers, Michael Sunseri and William Dorris, set up a roadblock just before the intersection of I-10 and I-310, which is at the edge of Lake Pontchartrain, to stop Clark. They parked two marked cars in the highway—at that point really a causeway with a high wall or curb along the lakeside. That left only the north shoulder of I-10 possibly open. Sunseri stood on that north shoulder with a 12-gauge shotgun to block the oncoming Clark. Dorris had a nine-millimeter semiautomatic handgun.

Clark avoided the cars already blocking his path on the north side of the highway by getting his motorcycle up on the north shoulder. Then he gunned his motorcycle straight for Sunseri.

What happened as Clark sped toward Sunseri is the subject of some dispute—at least as subsequent memories would recall—but what is clear is this: Both Sunseri and Dorris fired their weapons as Clark sped toward Sunseri. Those two discharges resulted in Clark sustaining a *bullet* wound to his right foot, as would be expected from Dorris's firing the semiautomatic weapon from a location somewhere to the *side* of Sunseri.

There is also no question that Sunseri fired his shotgun a *second* time. That second shot would ultimately bring this case to our court more than 13 years later, and half a continent away.

According to testimony that Sunseri would later give, as summarized by a Louisiana appellate court, Sunseri's second shot occurred, "*As* he jumped out of the way" of the speeding Clark. (*Clark v. State Dept. of Pub. Saf. and Corr.* (La.Ct.App. 2003) 861 So.2d 603, 606 (*Clark*), italics added.) As Sunseri's testimony was described by the Louisiana trial court judge, the speeding Clark passed Sunseri so close that Sunseri "could have reached out and grabbed him had he not been going so fast." The trial court also noted a passerby testimony that the second shot was fired "as the officer was jumping out of the way."

In any event, Clark collapsed "further up the roadway." (*Clark, supra,* 861 So.2d at p. 606.) A shotgun pellet had lodged in his spine, and had permanently paralyzed him.

There is no question that the shotgun pellet that ultimately severed Clark's spinal cord entered from the rear. There were two holes in the *back of Clark's shirt* and one hole in the front of the shirt. A Louisiana State Police Crime Laboratory report showed that there was lead residue on the *outside* of the two holes in the back of Clark's shirt—indicating that they were *entry* wounds—and that there was lead residue on the inside of the hole in the front of the shirt—indicating that it was an *exit* wound.

And that is exactly what one would expect if Sunseri, either in a fit of anger at seeing a maniacal motorcyclist coming straight at him at a high rate of speed, or merely as an instinctive reaction to having to jump out of the way of that motorcyclist, had simply spun around and shot Clark in the back.

Then there was the matter of the two shotgun wads. (A shotgun wad is a piece of paper, cardboard or plastic inside a shotgun cartridge that is used to contain the pellets or powder behind the pellets or both.) The two wads were found by Louisiana police. But those wads (described as a pristine plastic "O/P wad" and a "cardboard filler wad") were found by police *down* the causeway, toward the east, along a line between where Sunseri was standing and where Clark went down, paralyzed. In short, the two wads were found exactly where one would expect them to be if Sunseri had shot Clark in the back as he was heading away from Sunseri.

There were also *lighter* wad fragments found to the *west* of Sunseri— exactly where one would expect them to be from the first shotgun blast aimed directly at Clark as, coming from the west, he barreled down on Sunseri. Evidently *those* fragments had not been blown off course by any wind. Videotapes were made shortly after the shooting which gave at least some clue as to wind conditions. Records at nearby New Orleans International Airport showed maximum winds of 10 knots at the time.

And finally, there was the condition of the actual pellet that was found in Clark's spine. The pellet wasn't very damaged. The Louisiana State Police Crime Laboratory had the pellet examined under an electron microscope for embedded concrete particles, and the results were negative. That is, the physical condition of the pellet belied the idea that the pellet, fired at Clark simultaneously with his passing Sunseri, had somehow ricocheted off the concrete causeway and found its way into Clark's back.

## B. *The Battle of the Experts in* Clark

Clark sued the State of Louisiana, Sunseri, Dorris and others, and the case came to trial in October *2001*. Clark would lose the case when the trial judge

issued a formal statement of reasons for judgment and judgment, dated November 8, *2002*—that is, more than a year later.[2]

Each side employed a firearms expert. Clark employed Lucien Haag. Louisiana employed Paul Dougherty.[3] At the time both Haag and Dougherty were members in good standing with AFTE.

In the course of discovery in the *Clark* litigation (at least in an expert report and in a deposition), Dougherty came up with this scenario to explain Clark's wound from the back: Simultaneously with Clark's passing by him, Sunseri fired his second shotgun blast—that is, Sunseri fired his shotgun sideways—*as* Clark was passing him. Further, according to Dougherty, Sunseri fired at an extremely low angle, so that the injuring pellet ricocheted *twice*—once off the highway, and then a second time off the nearby curb close to where Clark was passing. And the pellet not only ricocheted, but ricocheted *upward* toward Clark, who conveniently turned his body on his motorcycle at precisely the right time for the upward traveling pellet to penetrate the back of his shirt. As for the shotgun wads that were found by police in a direct line between Sunseri and Clark, Dougherty theorized that Sunseri fired sideways or just ahead of him, so that the wads traveled 70 to 100 feet toward the west (where Clark was coming *from*) and then were *blown back* twice that distance in the direction where Clark was going.

## C. *November 2001: The AFTE Complaint*

That scenario or "reconstruction" was just too much for Dougherty's fellow AFTE member and opposing expert, Lucien Haag. Haag was so incensed with "conduct and testimony of Mr. Dougherty" that was "intellectually dishonest" that he began outlining ethics charges on his flight home from the October 2001 trial.

---

[2] The Louisiana trial judge's statement of reasons for judgment and judgment is dated November 8, *2002*, and the date is repeated in the published *Clark* decision (see *Clark, supra*, 861 So.2d at p. 604), the portion of transcript of that trial we have in our record. The basic chronology of ensuing events (such as the letter that started the Orange County, California, case we have before us now and the responses to that letter) indicate that the proper date for the actual *trial* was *2001*. Direct confirmation is to be found in a report by Lucien C. Haag written in April 2004, in which Haag pointed out that there was a trial in October *2001*, but that the ultimate judgment would not be handed down until "many months later." Many months turned out to be more than a year. The long delay between trial and trial court decision is of some significance in understanding how the private organization AFTE handled subsequent disciplinary proceedings against plaintiff in the case before us.

[3] The briefing is not entirely clear about the exact nature of Dougherty's role at the trial level, but in any event the charges that would eventually be brought against him had their basis in at least his deposition and in an expert report prepared *for* trial.

The result was a nine-page single-spaced letter dated November 9, 2001, to the chairman of AFTE's ethics committee, in which Haag accused Dougherty of "unethical conduct." He cited and quoted 10 provisions of AFTE's Code of Ethics. These 10 provisions may be summarized as:

—a requirement to serve the interests of justice at all times;

—a requirement to make adequate examination of material;

—a prohibition not to draw "unrepresentative, atypical, or unreliable" conclusions from materials;

—a requirement to conduct tests to disclose facts, and a prohibition from knowingly distorting any conclusions from any tests;

—a prohibition against assigning greater significance to an interpretation than is justified by available data;

—an affirmative requirement, if necessary under the circumstances, to indicate that an opinion may not be as certain as other opinions;

—a prohibition against assisting litigants so as to create a false impression;

—a prohibition against altering or distorting photographic displays so as to mislead a court or jury;

—a prohibition against using terms and opinions that give greater weight than is due; and

—a "moral obligation to see that the court understands the evidence as it exists" and to present that evidence "in an impartial manner."

Each of these rules was given a "count" number, so that, for example, the prohibition against altering photographic displays was "Count 9."

After giving the case background, the letter spelled out a series of narratives, and then, at the end of the relevant narrative, identified the "counts" that applied to that narrative. Thus, for example, Haag's letter described in a given paragraph portions of Dougherty's report asserting that the pellet taken from Clark's spine had ricocheted off a roadway and off a curb, and then identified that particular assertion as a violation of counts 4, 5, 6, 7, 8, 9 and 10.

Haag's letter was accompanied by six compact discs (two for each member of the three-person committee), which included a number of photographs, consisting of X-rays of Clark's spine, various CT scans made of Clark, and blowups of the pellet itself.

### D. *January-June 2002: Notice and Response*

On January 16, 2002, the ethics committee chair sent Dougherty a notice and copy of Haag's complaint, and invited Dougherty to respond within *30 days* of the receipt of the notice.

On March 2, 2002—after the 30-day deadline had passed—Dougherty wrote a letter to the ethics committee chair, stating that "This matter will have to be continued" because the Clark case had not yet "gone to verdict" and Dougherty and Haag "remain as potential witness[es]." (The trial judge still had the matter under consideration at the time, but the *trial* was over.)

Dougherty's letter alluded to "a number of documents which I will need to make a proper defense." Dougherty also acknowledged in his letter receiving a "binder of material along with Mr. Haag's complaint." The letter did not request a certain amount of additional time needed, or specify which other "documents" that Dougherty needed, or give any hint as to when the Clark case might yet "come to verdict."

Two months later—and having heard no more from Dougherty—the chair of the ethics committee provided the board of directors with a report on the complaint. The board determined that the ethics committee "should not conclude their investigation without receiving a response" from Dougherty.

Dougherty's response came in a three-and-one-half-page letter dated June 10, 2002. To summarize the letter:

(a) Under the heading "Wind": There were gusts of wind on the elevated highway on the edge of Lake Pontchartrain, and videotapes made just after the incident showed "markers moving and clothing being pressed against the people at the scene."

(b) Under the heading "Treatment of Evidence At Scene": There was considerable foot traffic at the scene and a certain "projectile" (not otherwise identified without reference to a certain diagram) was stepped on or kicked by one of the officers at the scene, and a "Federal shot shell recovered at the scene" showed damage as if it had been run over by a vehicle.

(c) Under the heading "The Pellet": Photographs showed damage to the pellet that could not be explained by the lamina or barrel of a shotgun alone, plus something about how other pellets impacted on the street,[4] and the fact that firing pellets at close range would produce a billiard ball effect: "What is important here is that the pellets were fired at fairly close range at an unyielding target." (As in the "Nixon Report" that would later be proffered by Dougherty before the general membership meeting, Dougherty seemed to be assuming his ricochet theory was an established fact.)

(d) Under the heading "Clothing": Acknowledging the fact there was a "roundish hole . . . in the rear" of a hooded sweatshirt and "four holes in the rear of a short-sleeved shirt," Dougherty said that, taken together with another "series of three holes" in a vertical line (one eight inches from the bottom seam), there was "a puzzling pattern for the rear-entering pellet." He said, "The immediate explanation that is easy and simplistic is that the three holes in the back center represent the entry of the pellet in the spine" but that those holes "are slanted to the right side so that one has the impression that the pellet is moving from left to right" which could occur "if the shirt were folded into three layers."

(e) Under the heading "Wounds": There was a 60-degree wound in the back to the right of the center of the spine, and another wound on the left side 14 degrees from the horizontal with "no right to left direction." The letter did not explain the significance of these facts, assuming that significance was self-evident.[5]

(f) Under the heading "Ronnie G. Clark's Position": Clark himself had indicated he was sitting straight when he was hit, but Clark's expert Haag had Clark "bent over the handle bars" so as "to produce the upward angle in the back from a direct fire shot."

(g) Under the heading "Sgt. Dorris's Position": Dougherty refuted an allegation in Haag's complaint that Dorris had changed his position (literally? "position" as in where he was standing at the time or "position" as in what

---

[4] We will now quote the rest of that paragraph. It is hard to summarize, because it is not exactly clear (to us at least) what Dougherty was actually talking about: "Pictures of the pattern at the scene show on the first strike of the flat surface of the road six oval pellet impact patterns with one of these, which may have some overlapping. (Ex. 4) There are, however, two elongated patterns with one small rectangular impact above these two patterns. (The shell contains 9 pellets.)"

[5] Again, Dougherty's prose is not exactly easy to understand. Here are his concluding sentences from this part of his letter: "There was also an issue about the lead debris in the wound track in the back. Since the pellet did not hit any bone until the spine, it would indicate further an intermediate target. This is entirely consistent with a ricochet, but not with direct fire."

happened—the letter does not say) after Dougherty and a state medical expert, Dr. Martin Fackler, had entered the case. The idea of the change was, according to Dougherty, "pure libel."

(h) And under the heading "Conclusion": Haag had brought up some "minor points" which Dougherty did not address because Haag's "whole thesis is based on the points I have addressed."

And with that, Dougherty requested "the whole matter be dismissed."

Appellant's appendix in this appeal shows three blurry images (as when on television digital technology is used to blur an image, such as a license plate or a face) attached to Dougherty's June 10 response. None of those images has enough detail, at least as reproduced in appellant's appendix, for us to make any comment.

### E. *Fall 2002: The Louisiana State Court Decision*

It appears from our record that the ethics committee would hold off on issuing its report until after Clark's trial against the State of Louisiana went to "verdict," because in any event the final report was not issued until January 2003. In the meanwhile, the trial judge issued a statement of reasons for a judgment in favor of the State of Louisiana and the state troopers, dated November 8, 2002.

The judge had had more than a year to reflect on his decision. The statement of reasons concentrates on the eyewitness testimony of events, and the trial judge found the testimony of both Dorris and Sunseri particularly credible. The trial judge found that Sunseri had fired the second shot *as* Clark passed him, that is, the shot was simultaneous with the passing.

The Louisiana appellate decision in *Clark, supra*, 861 So.2d 603, saw the case the same way. The opinion summarizes Sunseri's testimony this way: "*As* he jumped out of the way, Lt. Sunseri fired his weapon again." (*Id.* at p. 606, italics added.) Again, the idea was a discharge *sideways* at the passing Clark, or, *at best*, a point blank shot into Clark's back as Sunseri spun around at the speeding Clark.

Our record is not clear as to what precise role Dougherty had in the ultimate denial of Clark's claim by the Louisiana state and appellate courts. (Review was also denied by the Louisiana Supreme Court, but that is an uninteresting fact, given that the *Clark* case was highly factual, and we may

presume that the Louisiana Supreme Court thought that the Louisiana appellate court got its Louisiana law right.)

There is *no* specific summary or recounting of the forensic testimony or physical evidence in the Louisiana state trial court's decision. The trial court's written decision is based on eyewitness testimony. Likewise, the published *Clark* decision is structured as a series of summaries of eyewitness accounts. Neither Haag nor Dougherty is mentioned in the trial court decision, nor is there any reference to forensic evidence, such as all those details that we have recounted above, e.g., the pellet holes in the back of the shirt, or the shotgun wads found down the road toward Clark as he lay paralyzed.

There is, however, a one-paragraph *allusion* to forensic testimony in the appellate decision in *Clark* that suggests that Dougherty did actually play a role in the outcome. The paragraph came at the end of the court's summary. We will quote the entirety of that paragraph now: "The record also contains volumes of expert testimony and documents opining on the trajectory of the bullets [*sic*: the injuring projectile was a shotgun pellet] and the effect of any possible factors, which would show where the motorcyclist was in relation to the troopers when the shooting occurred." (*Clark, supra,* 861 So.2d at p. 610.)

The *Clark* opinion then quoted from the third paragraph of the trial judge's statement of reasons (which *is* also in our appellant's appendix) to the effect that the court had heard testimony from " '14 fact and 10 expert witnesses' " and " 'reviewed over seventy-five separately identified trial exhibits (including numerous photographs, diagrams, sketches, scientific journal articles, deposition testimony, shooting test results, and physical evidence).' " (*Clark, supra,* 861 So.2d at p. 610.)

Interestingly enough, though, *none* of that "physical evidence" was summarized, either in the trial court statement or the published opinion. The closest that any Louisiana court ever came to actually confronting those facts was in the next paragraph (after the summary of the quantity of evidence) in the *Clark* decision: "This court has also considered all of the extensive evidence in this case to review the findings of fact made by the trial court." (*Clark, supra,* 861 So.2d at p. 610.)

The *Clark* decision then proceeded to reiterate some classic doctrines about appellate courts' giving deference to trial court findings, and after that it finished *its* discussion on the forensic evidence, such as it was, with these

lines: "Where there is conflict in the testimony, reasonable determinations of credibility and reasonable inferences of fact should not be disturbed on appeal. [¶] The reasons for these well-settled principles of review are not only the trial court's better capacity to evaluate live witnesses, as compared to the appellate court's access only to a cold record, but also the proper allocation of trial and appellate function between the respective courts." (*Clark, supra,* 861 So.2d at p. 610.)

And with that, the *Clark* decision administered the coup de grâce to Clark's case: "Given the testimony and documentary evidence presented at trial, we do not find that the trial court erred in its factual finding that Lt. Sunseri was in fear for his life when he shot plaintiff. Accordingly, we find no merit in plaintiff's assignment of error regarding the factual findings of the court." (*Clark, supra,* 861 So.2d at p. 610.)

In short, neither the appellate *Clark* decision, nor the trial court, ever explicitly came to grips with those facts that strongly indicate Sunseri shot Clark in the back as Clark tried to speed away. The reasonable inference is that Dougherty's double ricochet theory influenced the Louisiana courts *not* to confront those facts on the general theory that the dueling experts simply cancelled each other out.[6]

### F. *January 2003: The Ethics Committee Report*

A formal ethics committee report was issued, dated January 3, 2003. That report was, literally, 49 pages. One thing that positively distinguishes that report from either the trial or appellate decisions in the Louisiana *Clark* case is that the ethics committee report includes an *explicit* recounting of the losing side's case. That is because, as the report was organized, it essentially copied relevant swaths of Haag's November 2001 complaint, followed by

---

[6] Indeed, the most eloquent language to be found in either Louisiana written decision is to be found in trial judge St. Pierre's statement of reasons, where he emphasizes how profoundly stupid Clark was to have acted as he did, with the implication that Clark simply got what he deserved: "Common sense says that one doesn't attempt to avoid police officers in the lawful performance of their duties by attempting to outrun them at speeds in excess of 120 miles per hour. Common sense says that one doesn't create havoc on an interstate highway by weaving through traffic and forcing law-abiding motorist[s] off the roadway. Common sense says that a motorcyclist doesn't make hand gestures toward a visible handgun located in his waistband while fleeing law enforcement officers. Common sense says one stops for a legitimate police roadblock. Common sense says that one doesn't accelerate a motorcycle as a motorcyclist approaches a roadblock. Common sense says that one doesn't aim a moving motorcycle in a direct line of travel towards a police officer who is performing his lawful duty. Common sense says that one doesn't place a police officer in fear of death or great bodily harm by directing a moving motorcycle at the officer. Common sense says that one doesn't become the aggressor towards an obviously armed law-enforcement officer who is attempting to effect a lawful traffic stop."

corresponding swaths from Dougherty's June 2002 response. The "original" part of the report is found in the conclusion on pages 48 and 49 of the report: "We believe that in most shooting reconstruction situations, the simplest explanation that is in concert with natural laws and the behavior of projectiles as we know it, is probably the best."

The ethics committee concluded that because of (1) the position of the wad, (2) the lack of damage to the injuring pellet, and (3) the "inordinately high angles of ricochet" required by the "ricochet theory," Dougherty had given testimony that "was not objective, not well supported by past experience or experiment and reflected either seriously flawed science or was a deliberate attempt to mislead the court."

The report would eventually be posted to the AFTE Web site around May 2004. Apparently, though, it went out without the initial approval of one of its members, a Tasmanian police ballistics expert named Gerard Dutton. When it was eventually posted to the Web site, Dutton would write a letter to Ann Davis, AFTE's president, to complain that his own name was "incorrectly spelt" on the final document. (Shades of a statement oft attributed to New York's 1920's mayor Jimmy Walker to the press, "You can write anything you want about me as long as you spell my name right.") Dutton called the report "absolutely dreadful" and in particular "unprofessional, confusing and repetitive" and in general, badly organized.

But Dutton's criticisms were only *literary*. As a composition teacher it appears he would have given the report a D-. *But*, he totally *agreed* with the substance of the report. He further said Haag had "presented a well-documented case" and specifically noted that Dougherty apparently did not examine the pellet for "grit from the impacts" of his double ricochet theory. Dutton's own bottom line was "yes he"—referring to Dougherty—"did knowingly do this," and by "this" he meant the rhetorical question posed in the previous sentence: "Therefore, did he *intentionally distort the truth to serve his own position and that of his employer*, without giving due consideration to a well-documented and compelling opposing hypothesis?" (Italics added.)

## G. *The Board of Directors Review*

It does not appear that the three-person ethics committee sent its report to Dougherty—at least immediately. What does appear is that by July 2, 2003, the committee *had* sent its report to at least the then president of AFTE, Robert Shem, who on that date wrote Dougherty to give him an opportunity to "address the complaints brought forward by Mr. Haag," at a "special hearing" of the board at some indefinite time in the future—possibly as much

as six months away if the board had its mid-year meeting in December. Dougherty replied in August of 2003. He requested a copy of the ethics committee report, all "Ex Parte communications from Mr. Haag to the Committee or other interested parties," and "A list of who will be present at the hearing and witnesses." He also asked how the meeting would be "memorialized."

Dougherty was sent *an* ethics committee report—according to his later declaration, it was a 34-page preliminary report—and a compact disc "containing videos and PowerPoint presentations" via a letter from Shem to him on August 22, 2003. Apparently, though, there was enough information in even this preliminary report for one to realize that Dougherty was being censured, since Dougherty would later submit a declaration to the Orange County Superior Court stating that "I timely appealed the Ethics Committee's decision to the AFTE's Board of Directors."[7]

In Shem's letter, Dougherty was told the hearing would take place on October 18, 2003, in Dallas. He was told that those present would be AFTE's board, its legal advisor, and at least one representative of the ethics committee.

Shem alluded in his letter that the scheduled date of October 18, 2003, and location in Dallas was a "date and location [that] have met with your approval." Dougherty would later dispute that in a declaration. He contended that he requested a continuance of the hearing so that his lawyer could be present, since his lawyer had "an unavoidable scheduling conflict." In any event, the meeting went forward. We need only note that the AFTE board is made up of individuals from all over the world who volunteer their time in a private organization. Getting them together before the next board meeting would have been very expensive indeed.

The hearing was scheduled for 1:00 p.m., but apparently there was a morning session where the ethics committee's findings were presented to the board. According to Dougherty's later declaration, when the afternoon session commenced, it began with the board asking Dougherty to "present evidence to rebut the Ethics Committee's findings." According to the same declaration, the board voted to expel Dougherty from AFTE that afternoon.

What that declaration does *not* describe (which would be described in a later declaration from incoming president Ann Davis) is that during the course of that afternoon Dougherty himself testified, as did Dr. Martin

---

[7] Though his declaration briefly described the basic scenario in the *Clark* litigation, like the Louisiana written decisions, this declaration would make no attempt to confront the pellets in the back of the shirt, the shotgun wads, or the lack of concrete grit in the pellet.

Fackler (who also had been an expert medical witness in the *Clark* litigation), another expert who was aligned with the State of Louisiana in the *Clark* case, Kerry Najolia, plus Dougherty himself "responded to detailed questioning by the Board members." Davis's declaration relates that after hearing from at least those three individuals, the Board voted unanimously that the ethics committee's'conclusions were well founded, and then voted eight to one in favor of expelling Dougherty from AFTE.

The board's decision was posted on AFTE's Web site as of November 12, 2003. The post, from President Davis, stated that "The Board of Directors has determined that AFTE member Paul M. Dougherty has violated the Code of Ethics. Mr. Dougherty has requested an appeal before the general membership at the next business meeting. So that you, the members, have ample opportunity to thoroughly review the materials on which the Board based our decision before the Vancouver meeting, the pertinent materials will be made available on this message board. The Ethics Committee report, the complaint and the defendant's response will be posted once we convert all of the documentation into a digital format. You will be alerted when these documents become available for your review. In the interim, your patience with respect to the specifics of this ethics complaint is appreciated."

One member wrote back two days later to say that he hoped and prayed that "the membership at large will be open minded and review the charges and response with due diligence as this is a very serious matter. A man's reputation is at stake as well as the entire AFTE organization, so we can do without any hyperbole until all the facts are presented."

### H. *Skirmishing Before the May 2004 General Meeting*

The general meeting would be held in Vancouver on May 24, 2004, but some noteworthy events occurred in between.

President Davis sent Dougherty, as a "courtesy," an e-mail link "to review the AFTE Ethics web page prior to release to the general membership," with the invitation to let her know if she had "inadvertently left pertinent materials out of the posting." An attorney for Dougherty, Bradford Powers (from the Louisiana firm that also represented the State of Louisiana in the *Clark* litigation and who are among the counsel who represent Dougherty in this California litigation) wrote to Davis saying that Dougherty "requests two weeks to review the proposed material so that he may accept in a reasonable fashion your invitation . . . to point out information that you may have

inadvertently left out of the materials." Davis eventually agreed to an extension to March 30, 2004.

Davis was sent two new items for posting: A report from Athena Research & Consulting dated March 30, 2004, authored by John R. Nixon (hence it is called the "Nixon Report" in the briefing) and the transcript of Dr. Fackler's deposition.

## 1. The Pro-Dougherty Nixon Report

The Nixon Report was about 18 pages, single spaced. The report was organized by a series of 28 "Specific Misconduct Allegations" listed on pages 7 and 8 of the report, apparently abstracted by Nixon. Following those 28 allegations were a series of short (one-to-three paragraph) rebuttals keyed to each of the 28 allegations. As the Nixon Report *framed* the allegations, there was no explicit acknowledgment of the facts that pellet holes were found in the *back* of Clark's shirt, or that a crime lab found *no concrete grit on the injuring pellet*, or that shotgun wads were found in a *straight easterly line between Sunseri and where Clark went down.*

The refutation to allegation 18 touched on the location of the pellet holes in the back, and, like the Louisiana written decisions, fell back on the idea that "experts disagree." Specifically, in response to the allegation that "Mr Dougherty misrepresents the location of the lead around the holes in the front of the shirts, saying that they were only on the inside," the entirety of the Nixon Report response was this: "There is clearly some discrepancy between the opinion of Mr Churchman and Mr Dougherty on this issue. Without access to better photographs and/or the clothing, it is not possible to offer a reliable opinion on this issue. It is evident, however, that Mr Dougherty provides an explanation for his opinion."

And that's it.

As to the shotgun wads, addressed in the rebuttal to allegation 23, the Nixon Report asserted that 10 knots is "quite a stiff breeze" and the strength of the wind could be verified in video footage, and besides, there was plenty of foot traffic that might have "contributed to wad movement." Specifically in regard to the lighter wads' being found to the west, the report had this explanation (readers can judge for themselves how convincing it is): "There is no way to reliably ascertain which wads came from which cartridge because the two sets of wadding were not differentiated and/or linked to

individual discharges. It is normal for fiber/cardboard shotgun wads to experience significant damage even when they hit nothing but air . . . ."

Shotgun wads were also addressed in the rebuttal to allegation 25, which confronted the problem of a theory that had wads fired to the west (these wads, we note, would have been fired *forward*—not even sideways), the wads would have had to go approximately 70 to 100 feet, and then be "blown back twice this distance (Eastward) to where they were found."

The refutation began with this sentence, apparently referring to the way the report had framed the allegation: "This statement does not appear to make sense." The substantive point that followed was that: "The wads from this second shot would have been very near the incident scene, and would only need to be blown and/or tracked 70 to 100 feet Eastward to where they were found. This explanation makes perfect sense because the wads from both shots would have travelled the same distance Eastward to the locations where they were subsequently found and logged. It should be remembered that these type of wads are extremely light . . . ."

Similar to Dougherty's June 2002 response to the ethics committee, the Nixon Report appeared to assume the truth of the double ricochet theory, hence this sentence in the introductory, background part of the report: "The main issue in the case was how Mr Clark came to sustain the two shotgun pellet wounds. Due to the double ricochet of one of the shotgun blasts the trajectory possibilities of 9 individual pellets became very complex."

In its conclusion, the Nixon Report referenced the fact that Clark had lost in the Louisiana trial court. Here is what it said under the heading "Opinions and Conclusions": "The matter was decided by a judge, who determined that the Dougherty-Fackler analysis was the most plausible, and ruled in favor of the defense. The judge's verdict was recently endorsed by the Louisiana Supreme Court."

With all respect to Mr. Nixon, we must point out that the copy of the trial judge's statement of reasons in our record most assuredly did not say that the "Dougherty-Fackler analysis was the most *plausible*." (Italics added.) Our copy contains no reference to Dougherty or Fackler (unless subsumed in a passing reference to 10 expert witnesses) and certainly makes no attempt at all to argue that double ricochet theory was the most "plausible" of competing theories. (We seriously doubt that Judge St. Pierre would ever have based his decision on the double ricochet theory's being the *most* plausible. At most, he might have concluded that it was barely *possible*, and hence there was no need to deal with what he thought was conflicting forensic evidence.)

## 2. The Aftermath of the Nixon Report

For his part, Haag prepared a response to the Nixon Report, correcting some obvious errors in the Nixon Report (such as the implication that the October 2001 trial had been only an "initial" trial). Specifically in regard to the pellet holes in the back of the shirt (which, as we have noted above, were not directly addressed in the Nixon Report), Haag said: "There is much that could be said on the role of Mr. Churchman and the State Crime Lab in this matter but to his credit he did not wa[ver] from his finding that the pellet that perforated Ronnie Clark's left side *enter in the back* (having produced a round hole in the left rear of his shirt with lead 'wipe' around it) and *exited in the front* (producing a slit-like exit with diffuse lead deposits on the inside of his shirt)." (Original italics and underlining.)

In any event, President Davis sent the new materials by e-mail to the other board members on April 14, 2004. None of the board members changed their mind, and on April 27, 2004, the AFTE board issued a reconsideration report to that effect. (The report does not go into any specifics.)

Then followed negotiations between Dougherty's attorney Powers and Davis over the protocols to be used at the general meeting regarding Dougherty's appeal. In an e-mail dated May 4 to AFTE's voting members, President Davis told them that materials on the case would be available to "voting members only" for limited times at the upcoming Vancouver convention on Saturday evening, May 22, and on Sunday, May 23, all day. Documents were also made available on the AFTE Web site, including the January 2003 49-page ethics committee report that would elicit Gerard Dutton's letter complaining about its misspelling of his name.

The meeting occurred Monday, May 24, 2004. About 100 members were in attendance.

### I. *The Meeting*

At the meeting Davis gave an opening statement followed by Haag's 83-page PowerPoint presentation. Part of his presentation included an affidavit from Churchman, who said he reviewed a transcript of Dougherty's testimony in October 2003 before the board of directors. Churchman disputed a number of statements which Dougherty had apparently made, perhaps the most significant of which was that any claim that a certain diagram (apparently suggesting that the injuring pellet came from the *front*) was a "cooperative effort" involving him, was "inaccurate."

Haag also included a second affidavit from Walter Rowe, a professor of forensic science at George Washington University. Rowe had also reviewed

the transcript of Dougherty's testimony to the directors back in October. Rowe contradicted claims that Dougherty had apparently made to the effect that Rowe was a "percipient witness" to the Clark shooting (he obviously wasn't), and that Rowe had been a standby witness to testify "in support of Mr. Dougherty's reconstruction" when, in point of fact, at the time of the *Clark* trial Rowe "was unaware" of that reconstruction.

Dougherty had been allotted 45 minutes, with an option to have an additional 30 more minutes if needed to call witnesses.

Dougherty used only 10 minutes of his time and called no witnesses. There was, however, a lengthy question and answer session afterwards, which belies any inference that there was not sufficient time at the meeting for Dougherty to use his full 45 minutes, or 45 plus 30 minutes.

Then the voting commenced, by secret ballot. Ninety-two members were present. More than 60 percent (56 votes that day) were needed to *sustain* the sanctions against Dougherty. Anything less than that supermajority would vindicate him. The members first voted by more than the required 56 votes to find Dougherty in violation of every one of the 10 "counts" in Haag's complaint.

Then Dougherty left the room, and the next vote concerned the actual sanction to be imposed. Without Dougherty's own vote, there were enough secret ballots to expel Dougherty from AFTE. However, Dougherty's attorney Powers requested that he be able to vote by proxy on Dougherty's behalf; Davis simply allowed Dougherty to reenter the room. Casting a vote in favor of himself resulted in his only being censured, as distinct from expelled.

### J. *The Orange County Litigation*

A little less than a year later, on May 16, 2005, Dougherty filed this action in Orange County Superior Court, seeking both a writ of mandate to overturn the censure and asserting various causes of action against Haag and AFTE (mostly tort; one was for breach of contract). Judge Didier denied the petition for writ of mandate in December of 2006, finding that, "Based upon the totality of the administrative record, this Court does not find any material deviations from the AFTE Bylaws or the Procedures for Enforcement of the Code of Ethics, nor does it find any credible evidence of bias, conflicts of interest, or procedural due process violations." The remaining claims quickly fell in a motion for judgment on the pleadings, and in January 2007, a judgment was entered in favor of Haag, AFTE, and the other defendants. Dougherty timely appealed in March.

## III. DISCUSSION

### A. *Procedural Unfairness*

The basic contours of the common law right of fair procedure in gatekeeper organizations have been fairly well mapped in the case law, though one must of course distinguish between cases going to the substantive validity of an organization's rules[8] from the levels of procedure (or lack thereof) afforded individual members. We are concerned here with the latter category. Dougherty makes no argument that AFTE's rules against misleading courts or drawing "atypical" conclusions from the evidence themselves run afoul of the law and thus could not be the basis of a censureship resolution.[9]

### 1. Canvassing the Case Law

In *Pinsker II*,[10] for example, an applicant to join a professional society was initially turned down for membership and—reminiscent of the protagonist in Kafka's The Trial—literally not told the reasons for the rejection. It turned out that the society had rules against delegating orthodontia work to a lesser qualified dentist (called "patient sharing" in the opinion), and a visit from a society member to the office of the applicant during the applicant's absence revealed that he " 'shared' " patients with such a dentist. When the applicant questioned the reason, he was at first unsuccessful, but (unlike the plot of The Trial) finally found out that patient sharing was the reason for the rejection. He would also at least later contend that he discontinued the practice of patient sharing then and there. The society rescinded its initial rejection, and notified the applicant it would reconsider his application. But, months later, the society again rejected the membership application, and without affording the orthodontist "an opportunity either to appear in person or submit a written statement on his own behalf for consideration at the meeting" that ultimately considered his application for the "final time." (*Pinsker II, supra,* 12 Cal.3d at p. 547.) No reason was given for the rejection, though it turned out that the local secretary went to lunch with two local orthodontists who told him

---

[8] For example, the a priori preclusion of Blacks from full membership in the labor union in *Marinship, supra,* 25 Cal.2d 721, or the preclusion of union members from campaigning for a right-to-work initiative in *Mitchell v. Internat. Assn. of Machinists* (1961) 196 Cal.App.2d 796 [16 Cal.Rptr. 813].

[9] For example, there is no issue here, as there was in *Otto, supra,* 75 Cal. 308, that the actual discipline somehow exceeded that called for in the organization's disciplinary rules. In *Otto,* our high court noted that the rules provided that members who violated the stricture against working for a party against whom a strike had been called were only subject to fine, without further penalty. Thus expulsion was "invalid." (*Id.* at p. 312.)

[10] *Pinsker I* established that the society of professionals there at issue was indeed a gatekeeper organization whose application decisions implicated the common law right of fair procedure.

they were "certain" that the applicant was still employing at least one nonorthodontist. (*Id.* at pp. 547–548.)

■ The Supreme Court noted that the "common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation] nor adherence to a single mode of process." (*Pinsker II, supra,* 12 Cal.3d at p. 555.) Thus the court declared that it "should not attempt to fix a rigid procedure that must invariably be observed." (*Ibid.*) But, the absence of "some meaningful opportunity to be heard" *either* "in writing or by personal appearance" meant that there had been no fair "opportunity [for the applicant] to respond to the charges raised against him," particularly after the point where, he contended, he had stopped patient-sharing and "was apparently unaware that anyone still questioned his qualifications." (*Id.* at pp. 555–556.)

If "opportunity to be heard" was missing in *Pinsker II,* the first half of the formulation that every law student learns by heart as the essence of due process—"notice"—was missing in the Supreme Court's next big fair procedure case, *Ezekial, supra,* 20 Cal.3d 267. There, a second-year resident at a Kaiser hospital was simply "advised [he] would not be permitted to remain" in the surgical residency program after a certain date. "No reasons were given to plaintiff, either then or subsequently, for Kaiser's decision to dismiss him." (*Id.* at p. 270.) And in fact, no reason can be detected from the body of the opinion, most of which was devoted to demonstrating that the resident *had* a common law right of fair procedure in relation to the hospital's residency training program.[11]

In contrast to *Pinsker I* and *Ezekial,* with their conspicuous absence of any opportunity to be heard, or notice, the plaintiff in another medical case,

[11] The more recent case of *Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060 [95 Cal.Rptr.2d 496, 997 P.2d 1153], is, in terms of what it can tell us about fair procedure, a variation on *Ezekial,* because in *Potvin,* as in *Ezekial,* the defendant organization took the position that the plaintiff's relationship with the organization was an "at will" relationship, and thus the plaintiff didn't have any right to be told of the reason for the termination of the relationship. (Compare *Ezekial, supra,* 20 Cal.3d at p. 275 [hospital urged position that "plaintiff is merely an employee whose connection with the hospital is terminable at will in the absence of a contrary agreement"] with *Potvin, supra,* 22 Cal.4th at p. 1064 [health insurer insisted contract allowed delisting of physician " 'without cause' "].) The organization—a health insurer with a list of "preferred providers"—struck the plaintiff off its list. The insurer insisted that it didn't have to give a reason for the deletion, but then added that the reason was the doctor's " 'malpractice history.' " (*Potvin,* at p. 1064.) The doctor requested a hearing, the insurer didn't respond, and the litigation ensued, and (as in *Ezekial*) most of the focus of the opinion was whether the organization at issue was covered by the right to fair procedure at all. As to what process was due, the Supreme Court simply affirmed the decision of the Court of Appeal, which framed the issue in the most elementary terms: The organization could not remove the doctor without having "given him notice of the grounds for its action and a reasonable opportunity to be heard." (*Potvin, supra,* 22 Cal.4th at p. 1065.)

*Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162] (*Anton*), was afforded plenty of both, and, accordingly, our high court had no problem in holding that the proceedings afforded him *did* comply with, as the court put it, the " 'minimal due process' which is applicable in proceedings of this kind." (*Id.* at p. 827.)

In *Anton*, an investigation by medical staff of a hospital indicated that a doctor was using " 'poor medical judgment' " and overutilizing the hospital. (*Anton, supra*, 19 Cal.3d at p. 809.) The investigation led to a committee report. The report was referred to a second committee, who forwarded it to the hospital's board of directors, which led to the doctor's summary suspension. (*Id.* at p. 810.)

And then the real due process began: The doctor was notified of his right to a preliminary hearing (there did not seem to be any issue of notice of the actual charges). The hearing was held, which upheld the suspension, then the doctor requested a "formal" hearing. A judicial review committee was appointed to review the recommendation, which included a very detailed list of the charges, and the doctor certainly had notice of those charges. (*Anton, supra*, 19 Cal.3d at p. 810.) Meanwhile, the board of directors changed the hospital's bylaws to bring them into conformity with model bylaws promulgated by a national hospital organization. Then a formal hearing was commenced before the judicial review committee (a court reporter was present) conducted under the *new* bylaws, which resulted in a recommendation of suspension. That in turn led to the doctor's written request for an "appellate review of the judicial review committee decision" and there was yet another hearing. However, under the new bylaws, the standard of review for this hearing was whether the doctor could show that the judicial review committee had not complied with the revised bylaws, or was otherwise not supported by substantial evidence. The result that the recommendation of the judicial review committee was affirmed, and the case thereupon went into litigation. (*Id.* at pp. 811–812.)

■ The Supreme Court declared (in part III. of its opinion)[12] that the doctor *had* been afforded fair procedure, even as against his various attacks on the hospital's process: The doctor never raised the issue of prejudice of any members of the judicial review committee when he had the chance (*Anton, supra*, 19 Cal.3d at pp. 826–827). The doctor never actually requested to be allowed to appear with counsel before the judicial review committee. (*Id.* at

---

[12] In part I. of its opinion the court held that the trial court should have used the "independent judgment" standard appropriate for administrative mandamus involving fundamental rights, rather than the substantial evidence standard. However, in part II. of its opinion the court held that the trial court properly proceeded as if the case were one in administrative (as distinct from traditional) mandate.

p. 827.) The doctor *did* have counsel at the next stage. Importantly, the court rejected the idea that bylaws that required the doctor to go forward with the evidence and burden of proof were "inconsistent with the requirement of minimal fair procedure." (*Id.* at p. 828.) Gatekeeper organizations, said the *Anton* court, have a flexibility in their " 'mode of process' " (*id.* at p. 829, quoting *Pinsker II, supra,* 12 Cal.3d at pp. 555–556) and the organization had the "discretion" to have such a bylaw, particularly given that the recommendation of suspension still needed a "substantial showing" to support it. (19 Cal.3d at pp. 829–830.) It was enough that procedures provided in the case provided "adequate notice of charges and a 'fair opportunity [for the affected party] to present his position.' " (*Id.* at p. 830.)

In contrast to the multiple levels of review in *Anton,* the procedural safeguards afforded the doctor in *Oskooi, supra,* 42 Cal.App.4th 233, were comparatively spartan, and yet still upheld as against a fair procedure challenge by a majority of another panel of this court. In *Oskooi,* it was enough that the doctor was simply notified why he was being summarily suspended (he had not disclosed certain information on his application) and given a hearing on that point, complete with hearing officer and court reporter. (See *Oskooi, supra,* 42 Cal.App.4th at p. 245 (lead opn. of Sonenshine, J.) and *id.* at p. 249 (conc. opn. of Sills, P. J.).)[13]

Specifically, the *Oskooi* majority held that even though a bylaw indicated that omission of the information might lead to outright dismissal and did not make reference to the lesser sanction of suspension, and even though a hospital letter informing the doctor that he could request a hearing made reference to that bylaw, the discrepancy between notice of dismissal and suspension was, in context, a mere "technical goof—a classic case of harmless error." The letter still told the doctor of the reason for the *suspension,* and gave him "every opportunity to rebut the charge that he [had] omitted vital information from his application." (*Oskooi, supra,* 42 Cal.App.4th at p. 250 (conc. opn. of Sills, P. J.); see also *id.* at p. 243, fn. 9 (lead opn. of Sonenshine, J.) [agreeing with the conclusions reached in Justice Sills's concurring opinion].)

---

[13] *Oskooi* is an example of how an opinion that might look, at a glance, to be a 1-1-1 split of a panel on the Court of Appeal may turn out, on examination, to be a straight 2-1 decision. The reason for the split (the author of the instant opinion was "present at the creation" and apologizes for the reference to himself in the third person) was that there were two issues: (1) Whether the plaintiff doctor had delayed his civil prosecution too long under the two-year rule, and (2) whether the plaintiff had received fair procedure from the hospital. Presiding Justice Sills and Justice Sonenshine agreed on issue (2), but Presiding Justice Sills did not necessarily agree with Justice Sonenshine on issue (1). Justice Crosby, in dissent, disagreed with Justice Sonenshine on issue (1) and with both Presiding Justice Sills and Justice Sonenshine on issue (2). We note here, though, that Justice Crosby's disagreement on issue (2) was basically over the *scope* of the discipline as set forth in the bylaws, as distinct from an absence of notice or opportunity to be heard in the actual process afforded the doctor.

Justice Crosby, in dissent on the procedural fairness issue, stressed the technical deviation from a bylaw contemplating, on its face, only dismissal as distinct from suspension. The irony is that Justice Crosby acknowledged that a full *dismissal* would have been *appropriate*, after a fair hearing. (*Oskooi, supra*, 42 Cal.App.4th at p. 256 (dis. opn. of Crosby, J.).) Nor did Justice Crosby find that anything about the hearing that the doctor actually received was procedurally unfair. Justice Crosby simply didn't think the evidence substantial enough to show an actual threat to patient care or safety given that the doctor's sin was omitting certain information on his application form. (*Ibid.*)

An appellate case similar to *Oskooi* in looking to the substance of whether the procedure was fair (as distinct from quibbling about the technicalities of provisions in the bylaws) was *Davis v. Int. Alliance etc. Employees* (1943) 60 Cal.App.2d 713 [141 P.2d 486] (*Davis*). There, a couple of stagehands were thrown out of the union for "promoting an organization" that would have "defeated the purposes" of the union. (*Id.* at p. 715.) (The opinion, rather coyly, does not disclose the nature of the organization the union found so offensive.) The stagehands sought relief in the courts, and the appellate court affirmed the denial of any relief: They received formal charges, they were given timely notice of the dates and places of their respective trials, the trials took place, and the trials "so far as appears" were "fairly conducted." (*Id.* at p. 715.)

There were in *Davis*, however, some departures from the union's constitution as to the exact procedures under which the trials were conducted. Charges had been filed with an "international representative" when the constitution required charges to be filed with the local union secretary. (*Davis, supra*, 60 Cal.App.2d at p. 716.) Charges should have been read at a regular meeting of the *local* union. They weren't. The presiding officer of the local was to refer the charges to a trial committee or an executive board. Instead, the international representative appointed the three members of the trial committee and the trial was held before those members. And instead of sending its report to the local union, the report was sent to the international representative, who actually signed the formal " 'sentences' " of expulsion. (*Ibid.*)

The *Davis* court recognized that these deviations, in "normal times" would have given the plaintiffs "cause for complaint." But the court noted that the union was in a state of emergency (the opinion was after all written right during the middle of World War II) and recognized that the union's constitution made provisions giving the international president powers to take over the administration of local unions during emergencies. (*Davis, supra*, 60 Cal.App.2d at pp. 716–717.) Significantly, the *Davis* court zeroed in on the

lack of actual prejudice from the change of procedures. (*Id.* at p. 720.) To be sure, the changes had essentially shifted the trial of the charges against the stagehands to a less favorable forum, depriving them of their home court advantage with the local. But the point was that the essentials of notice and opportunity to be heard had been observed. Said the *Davis* court: "In any event we deem the failure to comply with section 8 to have worked no prejudice to plaintiffs. '. . . associations of the kind here involved *are not bound to use the strict regularity of legal proceedings*, and in reviewing the proceedings taken by such organization relating to the enforcement of its disciplinary laws, the courts will disregard technicalities and not interfere because of a departure from form unless it appears that the accused has been denied a full opportunity to defend himself and the organization has not exercised its powers fairly and in good faith.' " (*Id.* at p. 720, italics added, quoting *McConville v. Milk W. D. Union* (1930) 106 Cal.App. 696, 701 [289 P. 852].)

## 2. Application to AFTE

One cannot review the case law covering the common law right of fair procedure without forming the distinct impression that, in this case, there was a surfeit of fair procedure. As in *Anton*, there were multiple layers of review, each one affording Dougherty the chance to tell his side of the story.

Consider, in that regard, the avalanche of "due process" AFTE afforded Dougherty in this case. He got: (1) in January 2002, a copy of Haag's lengthy initial complaint plus a whole binder of materials; (2) acquiescence to his own unilateral continuance of the ethics committee deadline to respond; (3) a board determination that the ethics committee should wait to hear from him despite having missed the initial 30-day deadline; (4) the opportunity to respond in writing, point-by-point, to the initial complaint, in June 2002, after missing the initial 30-day deadline; (5) acceptance by the ethics committee of his request that any decision be held off until after the Louisiana trial court issued its formal decision; (6) an invitation from the president of AFTE in July 2003 giving him an opportunity to "address the complaints brought forward by Mr. Haag," at a "special hearing" of the board; (7) in August 2003, a copy of a 34-page preliminary ethics report plus a compact disc; (8) the opportunity to be heard before the board in October 2003; (9) the opportunity to personally testify at the October 2003 board meeting, and present the testimony of other experts with whom he had been aligned in the Louisiana case; (10) the posting of the case against him on the organization's Web site in the period prior to the annual convention; (11) the opportunity to post, in his defense on the Web site, the "Nixon Report"; (12) posting of the reconsideration report by the board prior to the meeting; (13) availability of hard copy materials to the membership prior to the voting, including any

items he wanted included in his own defense; (14) the opportunity to address the membership himself for 45 minutes at the general meeting; (15) the opportunity to call witnesses on his behalf at the general meeting for 30 minutes; (16) secret ballot voting; (17) the requirement of a supermajority to sustain any sanctions against him; and (18) a rule bent in his favor to allow him to vote on his own sanction, which tipped the balance from expulsion to mere censure.

■ In short—the notice and opportunity to be heard in the period 2001 through 2004 afforded by AFTE to Dougherty is virtually breathtaking. Dougherty had multiple notices of the precise charges against him, multiple opportunities to tell his side of the story, multiple opportunities to complain about the composition of any of the adjudicatory body, and an ultimate adjudicatory body (the convention) that required a supermajority to sustain any sanction (which is better than the plaintiff got in *Anton*).

Indeed, the irony is: Because Dougherty was afforded *so many* levels of review and so many opportunities to explain his position, his appeal is essentially a series of petty cavils lodged against each level of review he received, as if AFTE were somehow obliged to operate by the California Evidence Code and Code of Civil Procedure and without any regard to a requirement of prejudicial error. These we may deal with summarily.

*At the ethics stage*: Dougherty complains that he didn't get a notice of referral via registered mail (but he did receive the forwarded Haag complaint); the committee wrote a report after Dougherty had asked for a continuance (but he ignores that he got far more than 30 days, and his request was open-ended and evasive); the ethics committee really did not "investigate" even though the charges were that he "knowingly" was unobjective about the Louisiana case (Dougherty's scienter is pretty obvious from his continuing maintenance of the double ricochet theory to this very day); he didn't get the ethics report until eight months later (but he clearly got the Haag complaint and had the report prior to the directors meeting); the report itself wasn't organized well and was just a cut and paste job (even so, it identified the three major items that render his double ricochet theory ludicrous).

*At the board of directors stage*: Dougherty complains that he was denied the right to have counsel of his own choosing (but only because he chose counsel who could not make a hard-to-schedule board meeting); the board went forward with the ethics committee's "vague and conclusory report" (which is still clear enough to give anyone who reads it a good understanding of the three major items that cast doubt on Dougherty's double ricochet thesis); he couldn't "question his accuser" (the case did not turn on Haag as

percipient witness); the board didn't give him a chance to voir dire the board for conflicts of interest (AFTE is a private organization whose board was chosen independently of this disciplinary matter); the board shifted the burden of proof to him (which is not a valid inference from the fact that he was invited to defend himself, but even if so, a prima facie case had already been made); the board voted only once on all ten accusations (so?); the board failed to issue its own report substantiating each charge with "clear and convincing evidence" (so?); the board allowed Haag to respond to the Nixon Report (the Nixon Report was *new*, Haag's rebuttal was new, so both were made available to the membership).

*At the membership stage*: Dougherty complains that AFTE's Code of Ethics is vague (it's clear enough that an AFTE member should not mislead a court); there are no clear procedures for discipline at a general membership meeting (Dougherty was the first, so protocols were worked out for the first time); Dougherty's time to present his defense was limited at the convention (no—he just didn't take all of it); he was denied effective representation of counsel by a protocol because only he *or* his attorney was allowed to speak, but not both of them (which happens all the time in real courts too); there were two new affidavits that "ambush[ed]" him at the general meeting (both were rebuttals to board statements of fact); he wasn't allowed to protest at the meeting procedural defects at earlier stages (he had plenty of opportunity to challenge the ethics committee report to the board); there were no instructions to the membership on burden of proof (belied by the fact that a 60 percent vote was needed to *impose* sanctions; that shows the "default" result was exoneration); there was no requirement that voting members actually review the written evidence (which would have been physically impossible given how much there was of it, which is why AFTE has an ethics committee and a board in the first place).

And Dougherty also complains about the alleged partiality of certain members of the ethics committee and on the board (he had lots of opportunity to complain at the time); about the fact that AFTE's president initially presented the case as well as presided over the meeting (she was a representative of the board, after all); and about the board's Web site posting that it had used "extreme diligence" in coming to its conclusions (which is a drop in the bucket when one examines the ocean of materials made available to the membership). Dougherty further complains about AFTE's use of its legal advisor as a hearing officer at the meeting (he is, after all, a lawyer in an association of scientists—who else to act as a hearing officer?); the organization's allowing Haag's son, also a member, to ask numerous questions during the question and answer session (there is no indication that Haag's son was not a voting member or otherwise disqualified from asking those questions); and further, finally, the fact that some members of AFTE have received

considerable income from referrals from Haag (which is to be expected in a small, private organization, and ignores the fact that the ultimate voting was by *secret ballot*).

This swarm of nits simply disappears into the ocean of due process that AFTE afforded Dougherty. Indeed, Dougherty's shotgun blast of complaints are reminiscent of the double ricochet theory itself in their focus on the unessential and disregard of the fundamental.

### B. *Public Policy*

A legal point Dougherty makes is that his censure was contrary to California's litigation privilege. He did not raise this issue below and it is therefore waived. (In any event, it would not apply to a private organization that polices the integrity of its own members.)

### C. *Judgment on the Pleadings*

Since the denial of the writ was correct, the judgment on the pleadings on the rest of Dougherty's claims was correct. Haag's involvement in the case was solely an aspect leading to the AFTE censure of Dougherty.

### D. *Fees on Anti-SLAPP Motion*

Early on in this case AFTE brought an unsuccessful anti-SLAPP (strategic lawsuit against public participation) motion on the theory that *AFTE* has a First Amendment right to police its members from giving unethical testimony in court. Dougherty now claims the motion was frivolous, ergo the trial court was obliged to award him his fees on it. The argument was certainly colorable enough that there was a public interest in AFTE's censure.

## IV. CONCLUSION AND DISPOSITION

Stepping back from this appeal, however, there is something very heartening about this case: A private organization whose purpose is to ensure the integrity of expert testimony actually had the gumption to censure a member whose testimony bordered on the ludicrous—roughly the equivalent of saying that a shotgun can shoot at a right angle. The organization painstakingly gave the errant member multiple opportunities to explain why his testimony wasn't as bad as it looked, and ultimately, after about four years of internal due process, his peers censured him. In our opinion, they didn't deserve a lawsuit, they deserve a medal.

The judgment is affirmed. Respondents are to recover their costs in this appeal.

Fybel, J., and Ikola, J., concurred.

A petition for a rehearing was denied August 22, 2008.